**Gene SMITH, Petitioner–Appellant,**

**v.**

**Lanson NEWSOME and Michael Bowers, Respondents–Appellees.**

**Danny SMITH, Petitioner–Appellant,**

**v.**

**Lansome NEWSOME and Attorney General for the State of Georgia, Respondents–Appellees.**

**Nos. 87–8314, 87–8477.**

United States Court of Appeals, Eleventh Circuit.

June 19, 1989.

Warren Ott, King & Spalding, Atlanta, Ga., (court appointed), for Gene Smith.

Raymond Kelley, Westmoreland, Patterson & Moseley, Macon, Ga., (court appointed), for Danny Smith.

Mary Beth Westmoreland, Asst. Atty. Gen., State Law Dept., Atlanta, Ga., for respondents-appellees.

Appeals from the United States District Court for the Middle District of Georgia.

Before JOHNSON and EDMONDSON, Circuit Judges, and NICHOLS *, Senior Circuit Judge.

EDMONDSON, Circuit Judge:

Gene Lamar Smith ("Gene") and Danny Smith ("Danny") were indicted in Colquitt County, Georgia, for burglary and murder and were tried separately. Gene was convicted of both charges and was sentenced to consecutive terms of life and twenty years. Danny was convicted of felony murder and burglary, but the court set the burglary conviction aside as a lesser included offense. Danny was sentenced to life imprisonment. The Supreme Court of Georgia affirmed the convictions and sentences. Gene filed two consecutive state habeas corpus petitions; Danny filed one. All were denied. The United States District Court for the Middle District of Georgia denied the instant petitions in which each brother claims, among other things, that he received ineffective assistance of counsel based on a conflict of interest and that the jury charge on intent impermissibly shifted the burden of proof. We affirm.

I. BACKGROUND

Reggie Bostick discovered the body of his father, Elton "Pete" Bostick, lying on the ground beside the elder Bostick's car which was parked alongside the road. The victim had been shot in the head. The car was running, and the door on the driver's side was open. The police later found markings at the scene which suggested a struggle. At about the time of the murder, a house across the road from the scene of the murder had been burglarized.

A witness heard three shots fired at about the time of the murder, two close together and one a minute or so later. Three .223 caliber shell casings were found near the body. According to the younger Bostick, his father had left home earlier carrying a .223 caliber rifle in the car with him. This rifle has disappeared.

A doctor testified that the cause of death was a high velocity bullet entering the victim's right ear, travelling upward and backward, and exiting through the top of the head. Dr. Larry Howard, director of the Georgia crime lab, testified that the wound could have been made by a bullet fired from a .223 caliber rifle. The body also appeared to have been run over by a car.

Months after the crimes, a Colquitt County Deputy Sheriff received a tele-

---

* Honorable Philip Nichols, Jr., Senior U.S. Circuit Judge for the Federal Circuit, sitting by designation.

phone call which led to an interview with Shirley Baker who claimed to possess knowledge about the incident. Although Baker for some time claimed not to have been present at the time of the shooting, she ultimately admitted that she was there, and she implicated petitioners. Petitioners surrendered themselves, and the state trial court appointed G. Keith Murphy to represent both.

The parties stipulated in writing that Shirley Baker and petitioners would undergo polygraph tests, which were to be administered and interpreted by an expert polygraph examiner. Both petitioners and their attorney signed these stipulations. The examiner stated that he believed that Baker truthfully answered "yes" to questions whether she knew who shot Pete Bostick, whether she was present when Bostick was shot, whether Gene Smith shot Bostick and whether she was with Gene and Danny Smith when Bostick was shot.

Petitioners were asked whether they knew who shot Pete Bostick, whether Gene Smith shot Bostick, and whether they knew what happened to the gun that was used to shoot Bostick. They answered "no" to each question, and the examiner believed that petitioners' answers were untruthful.

Baker testified at trial that she and the petitioners were committing a burglary when the victim, who was a special deputy sheriff, came upon the scene. According to Baker, Gene struggled with Bostick, wrested a rifle from the victim and shot him with it. Baker testified that in trying to get away she ran over the victim's feet.

## II. DISCUSSION

We review the dismissal of habeas petitions keeping in mind the limited (albeit extremely important) role of federal habeas corpus. "When the process of direct review ... comes to an end, a presumption of finality and legality attaches to the conviction.... The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials." *Barefoot v. Estelle,* 463 U.S. 880, 887, 103

S.Ct. 3383, 3391–92, 77 L.Ed.2d 1090 (1983). Federal habeas corpus "imposes special costs on our federal system.... In criminal trials [the States] ... hold the initial responsibility for vindicating constitutional rights. Federal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." *Engle v. Isaac,* 456 U.S. 107, 128, 102 S.Ct. 1558, 1572, 71 L.Ed.2d 783 (1982).

### A. *Ineffective Assistance*

 The state solicited Danny Smith's testimony against Gene, and Danny's lawyer discussed this proposal with Danny. Gene argues that he received ineffective assistance of counsel because his lawyer represented conflicting interests by participating in plea bargain negotiations on behalf of Danny but not Gene. Danny complains that Murphy could not vigorously pursue a plea bargain for Danny while representing Gene.

"[T]o demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980); *Strickland v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed. 2d 674 (1984). Petitioners cite *Ruffin v. Kemp,* 767 F.2d 748 (11th Cir.1985), in which counsel negotiated a plea bargain for one of his two clients to the exclusion of the other. The *Ruffin* court concluded that *"[o]n the facts of this case,* [counsel's] conduct of actual plea bargain negotiations for Brown, offering as part of the deal Brown's testimony against his own client, precluded effective plea bargaining on behalf of Ruffin and thus constituted an adverse impact on counsel's performance." *Id.* at 752 (emphasis added).

*Ruffin* is distinguishable from this case; here, joint representation did not prevent effective plea bargaining on behalf of either client. The *Ruffin* court expressly relied on the fact that the prosecutor was open to plea negotiations. *Id.* Gene's lawyer testified by deposition at Gene's first

state habeas hearing that plea negotiations for Gene were precluded, not because of the possibility of a deal for Danny, but because the state was unwilling to bargain with Gene: evidence indicated that Gene was the trigger man, and the prosecutor was seeking the death penalty. On this record, Murphy's joint representation of Gene and Danny did not alter the possibility of a bargain for Gene.

Nor does Danny demonstrate an adverse impact on his lawyer's performance. Murphy testified at Danny's state habeas hearing that he could not negotiate a deal for Danny because Danny refused to testify, consistently denying any involvement in the crimes. Even if Murphy had represented only Danny, Murphy could not have negotiated a plea for Danny because Danny always claimed to have no testimony to offer the state. Petitioners have not established that their lawyer's performance was adversely affected.[1] Because we conclude that the performance of petitioners' lawyer was not adversely affected, we do not address whether an actual conflict existed.

## B. *Jury Instructions on Intent*

The state admitted at oral argument that the trial court's jury charge on intent in this case was quite similar to other charges which we have held violated *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), but the state contends that Gene has shown no cause for his procedural default of this issue and that any error in the instruction was harmless be-

yond a reasonable doubt as to both petitioners.

### 1. Procedural Default

The district court found that Gene's claim on the *Sandstrom* issue was barred by state procedural default. Gene raised the issue for the first time in his second state habeas proceeding. According to O.C.G.A. sec. 9–14–51 (1982),

> [a]ll grounds for relief claimed by a petitioner for a writ of habeas corpus shall be raised ... in his original or amended petition. Any grounds not so raised are waived unless the Constitution of the United States or of this state otherwise requires or unless any judge ... finds grounds for relief asserted therein which could not reasonably have been raised in the original or amended petition.

The purpose of this rule is "to speed the finality of a defendant's conviction and the execution of his sentence, with efficiency and due consideration for the defendant's right to a full and fair hearing." *Presnell v. Kemp*, 835 F.2d 1567, 1573 (11th Cir. 1988). The rule properly stresses the importance of a trial, prevents the piecemeal collateral review of convictions which are presumptively valid, promotes finality and preserves scarce judicial resources. "[P]rompt finality ... deters others from committing crime." *Id.* The state's important interest in prompt finality is undercut by successive collateral attacks on convictions and sentences.[2] The goals served by Georgia's successive petition rule are

---

1. As evidence that Murphy's performance was adversely affected, petitioners also point to Murphy's explanation at Danny's state habeas proceeding of why counsel did not take the stand and testify to an exculpating statement made to him by the state's star witness: "Of course, I was able to question Shirley Jean Baker about this and she denied it, ah, in front of a jury that she'd ever had that conversation with me; that she, ah, never told me that and, ah, I felt that I was able to get that point across to the jury as concerning her credibility at that point in time, and I decided that nothing would be gained and I felt a good bit would be lost if I then stepped up there and tried to testify while I was representing both defendants. A matter of strategy, Your Honor." Record, Exhibit 4, at 32. Without reflecting on the soundness of this "strategy"

we do not think this explanation indicates, as petitioners suggest, that Murphy decided against taking the stand because of a conflict between his duty to Gene and his duty to Danny. Murphy did not state that he avoided the stand because he was representing both defendants. As we understand it, Murphy decided not to take the stand because he determined that he had adequately challenged Shirley Baker's credibility and that taking the stand would weaken him as an advocate for both defendants.

2. For a further discussion of the importance of finality in criminal cases, see Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments,* 38 U.CHI.L.REV. 142, 146–51 (1970).

served only to the extent that courts, state and federal, honor the rule.

The Georgia successive petition rule is not an absolute bar to subsequent petitions. Georgia's rule bars a successive petition raising new claims only if the new claims could reasonably have been raised in an earlier petition. In response to the state's argument at his second state habeas hearing that Gene's second petition was successive, Gene brought up his illiteracy. The state court held that Gene had shown insufficient reason for failing to submit this claim in his earlier petition and therefore dismissed Gene's second petition as "successive" under O.C.G.A. sec. 9–14–51.

■ "A defendant who is procedurally barred from raising a federal constitutional claim in state court is also barred from raising the claim in a federal habeas petition unless he can show cause for and actual prejudice from making the default." *Gates v. Zant,* 863 F.2d 1492, 1500 (11th Cir.1989); *accord Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). The cause and prejudice standard applies to a pro se litigant, *Alexander v. Dugger,* 841 F.2d 371, 374 n. 3 (11th Cir. 1988), and to claims barred by a state's successive petition rule. *Presnell,* 835 F.2d at 1577–78.

### 2. Cause for Default

■ The *Sandstrom* claim was available[3] when Gene filed his first state habeas petition, but no *Sandstrom* claim was presented at that time. As cause for this default, Gene cites his illiteracy and lack of ability to understand the state habeas proceedings. In reviewing this argument we must face this fact: Gene, still acting pro se, raised the *Sandstrom* issue in his second petition. This is not a case where an issue is intrinsically beyond the pro se petitioner's ability to present.

On Gene's claim of inability to understand the state habeas proceedings, we assume that a pro se habeas petitioner who lacked the mental capacity to understand the nature and object of habeas proceedings and to present his case for habeas relief in a rational manner would have cause for omitting a claim in such proceedings. But a person's being illiterate does not mean that the person lacks good sense. Nor does lack of formal education make a person mentally incompetent. There is no right to legal counsel in collateral proceedings, *Hooks v. Wainwright,* 775 F.2d 1433, 1437–38 (11th Cir.1985); thus, the failure to act or think like a lawyer cannot be cause for failing to assert a claim. Although Gene did not mention it in his appellate briefs (Gene filed a brief pro se and his court-appointed counsel also filed a brief; both were well done), in his pleadings to the district court Gene alleged that his I.Q. was "well below average." Because no evidentiary hearing was held by the district court, we accept this allegation at face value; but because not every mental deficiency amounts to incompetency, the allegation is insufficient. *See McCune v. Estelle,* 534 F.2d 611, 612 (5th Cir.1976) (low intelligence does not equal mental incompetence).

Moreover, we would find no support for an argument that Gene is mentally incompetent in the sense of being incompetent to stand trial. No one has ever asserted that Gene was mentally incompetent when he was originally tried for murder. In addition, we have read the transcript of Gene's state habeas hearings where Gene spoke for himself. Although he did not perform at these hearings as a competent lawyer

---

**3.** This claim was not novel at the time of Gene's first state habeas petition. *Sandstrom* had been decided. Although Gene suggests in his initial brief that this claim was not available until the Supreme Court decided *Francis v. Franklin,* 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), the Supreme Court stated unambiguously in *Franklin* that *Franklin* did not "extend" prior law. *Franklin* 471 U.S. at 317–18 n. 5, 105 S.Ct. at 1973 n. 5; *see Yates v. Aiken,* 484 U.S. 211, 108 S.Ct. 534, 538, 98 L.Ed.2d 546 (1988) (*Frank-*

*lin* "did not announce a new rule.") This court also has recognized that *Franklin* provided no novel basis for relief: "In *Franklin,* the Supreme Court noted that the basis for the decision in that case preceded *Sandstrom* and could be traced back to the Court's earlier decisions...." *Presnell* 835 F.2d at 1582 n. 28. Although Gene may have been more confident of the validity of his claim after *Franklin,* the claim was available, as a matter of law, long before his first state habeas proceeding.

would, his performance appears rational in every way: he knew where he was; he knew why he was in court; he stated his contentions plainly; the contentions were not absurd; and he responded directly to questions. In these circumstances, Gene's general mental condition is not legal cause for his default.

The state does not dispute Gene's illiteracy, and we have no reason to doubt it. But the Supreme Court has suggested that cause ordinarily turns on some objective factor external to the petitioner. *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2646, 91 L.Ed.2d 397 (1986). Gene's illiteracy does not explain why he failed to raise this issue in his first state habeas petition. We know that illiterates, using scriveners, can and often do assert arguably valid claims; Gene in his second petition advanced pro se the *Sandstrom* claim. Gene said at his second state habeas hearing that he lost contact with a jailhouse lawyer during the first habeas proceedings, but he does not assert that Georgia or his custodians unduly obstructed his efforts to get other help or to handle his case—including asking for more time—as he saw fit. The Ninth Circuit has already rejected the argument that illiteracy equals cause for a default in collateral proceedings even when the petitioner loses the help of a jailhouse lawyer. *Hughes v. Idaho State Bd. of Corrections*, 800 F.2d 905, 909 (9th Cir.1986). To find cause in this case would, in effect, establish a per se rule of cause based on illiteracy.[4]

Because of the wide variety of contexts in which procedural defaults can occur, the Supreme "Court has not given the term 'cause' precise content." *Reed v. Ross*, 468 U.S. 1, 13, 104 S.Ct. 2901, 2909, 82 L.Ed.2d 1 (1984). Per se rules of cause would not

allow the necessary flexibility to address the varied contexts in which procedural defaults can occur.

To hold that illiteracy is cause for state procedural default would allow those petitioners who happen to be illiterate to engage in forum shopping. Claims could be reserved for federal court if the petitioner perceived that the federal fact-finder might be more sympathetic to those claims than the state fact-finder. *See Presnell*, 835 F.2d at 1579. To the extent that state courts would not get the first chance to review petitioners' claims, the exhaustion doctrine would be undermined, and the importance of state collateral review would be reduced. *See id.* Particularly in the light of the secondary and limited role of federal collateral proceedings as devices of constitutional protection for state prisoners, these federalism concerns, stressing the proper role of state courts in preventing unconstitutional confinements and the importance of finality of state convictions, are due great respect.[5]

Nor do we sense any inequity in requiring an illiterate pro se petitioner to raise all issues—that lie within his ability to raise at all—in his first petition. Even representation by the most competent lawyer is no guarantee that all colorable issues will be raised. We hold parties represented by counsel responsible for their lawyers' mistakes. *See Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645. Where, as here, a pro se petitioner is able to raise an issue, it would be inequitable to give him a "second bite at the apple" when he initially defaults the issue while we deny a second chance to the petitioner whose counsel fails to raise the issue. Furthermore, as we noted earlier,

---

**4.** Gene's lawyer suggested at oral argument that the cumulative effect of the difficulty of the issue, Gene's mental inability, and Gene's illiteracy amounted to cause. We disagree. We think that the difficulty of the issue and Gene's precise level of mental ability add nothing to his claim of cause. On the difficulty of the issue, the question is whether the claim was "available", *see Smith v. Murray*, 477 U.S. 527, 537, 106 S.Ct. 2661, 2667, 91 L.Ed.2d 434 (1986), not the complexity of the issue. On Gene's mental ability, we find it constitutionally irrelevant as

long as he is "competent" enough to be bound by his actions.

**5.** These important federalism concerns make state procedural defaults materially different from the abuse of the writ problem involving successive federal habeas petitions. *Cf. Engle*, 456 U.S. at 134, 102 S.Ct. at 1575 (federal habeas challenges to state convictions entail "special comity concerns" not present on direct review of federal convictions).

the states have rights to reasonable rules of finality.[6]

### 3. Harmless Error

■ This court has identified two situations in which a *Sandstrom* violation can be harmless: "if the evidence was overwhelming ... and if the instruction was applied to an element of the crime which was not at issue at the trial." *Davis v. Kemp*, 752 F.2d 1515, 1521 (11th Cir.1985) (*en banc*). "[T]he inquiry under the first prong of the harmless error test should ordinarily focus on whether there exists overwhelming evidence of intent, rather than the more inclusive question of guilt." *Stephens v. Kemp*, 846 F.2d 642, 659 (11th Cir.1988). "Thus, in many cases, a *Sandstrom* error as to intent can be found harmless where the evidence of intent is overwhelming, even where there is conflicting evidence as to whether the defendant" actually committed the crime. *Drake v. Kemp*, 762 F.2d 1449, 1454 (11th Cir.1985) (*en banc*).

Danny did not default the *Sandstrom* issue. The grand jury indicted Danny for malice murder and burglary. There is no evidence that Danny participated in the struggle or the shooting of the victim. Although the court instructed the jury on parties to a crime and conspiracy, Danny was convicted of felony murder only. Intent is not an element of felony murder.

Because here we decide only whether the presumably improper charge *on intent* was harmless, the state need not show that the evidence was overwhelming that Danny was present when the underlying felony was committed. The jury found that he was. An improper intent charge would not affect that finding. In Danny's case, the relevant question for the harmless error analysis is whether there was overwhelming evidence that if he participated in the burglary, he acted intentionally.

We conclude that the evidence was overwhelming that if Danny committed the acts alleged in the indictment, he acted intentionally. Shirley Baker testified that Gene, Danny and she drove around looking for a house to burglarize and that Danny was directly involved in the burglary and was an equal participant with Gene in everything but the shooting. There was no evidence at trial from which the jury could have concluded that Danny was an unknowing or unwilling participant in the burglary.

### C. *Polygraph Examination*

■ The parties entered written stipulations regarding the admissibility of the results of the polygraph examinations of the petitioners and Shirley Baker. These stipulations provided that the attorneys were to receive the opinion of the expert polygraph examiner; also, the tests, results and opinion of the examiner were to be admissible at trial. Shirley Baker made some aborted attempts to take a polygraph examination. Counsel for petitioners filed a *Brady* motion in which he contended "that all particulars with regard to said attempted polygraph examination should be made known to the Defendants...." Record, Exhibit 4 at 40. At a pretrial motions hearing defense counsel asked for "the actual graph, and any other written papers, or graphs or whatever he has...." Record, Exhibit 1 at 9. The prosecutor responded that he did not have the information defense counsel was requesting and that there was no agreement that anyone but the stipulated

---

6. The "cause and prejudice" standard is a strong constraint on federal court interference with state convictions when the state prisoner has not complied with legitimate state procedures. The standard places a heavy burden on the defaulting petitioner. But any potential for harsh results is tremendously reduced by this universally recognized and critically important exception to the "cause and prejudice" rule: "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Carrier*, 477 U.S. at 496, 106 S.Ct. at 2650. There was ample evidence for the jury to convict Gene, and we cannot say that he is probably innocent of murder. Incidentally, strong, if not overwhelming, evidence indicated that the victim was intentionally slain; and Gene's lawyer did not dispute intent at trial, telling the jury that Bostick's death was murder. It seems unlikely that the charge on intent resulted in Gene's conviction.

expert would review the results. *Id.* at 10. The court overruled the motion.

Danny argues that the state failed to comply with the agreement concerning the admission of polygraph evidence.[7] Danny does not contend that he was denied the opinion of the expert examiner. Nothing in the written stipulation provides that the tests or results would be provided for independent review before trial. Although the parties stipulated that the tests and results would be admissible, nothing indicates that defense counsel attempted to have the graphs subpoenaed for trial.

Danny argues further that part of the agreement allowing the admission of the polygraph results in this case was that the state would give the defense a committal hearing even though the petitioners had already been indicted. At the hearing, defense counsel did not get to ask as many questions as he wanted to ask. Danny argues that the state breached the agreement to provide a full and fair committal hearing; but petitioners' trial counsel testified at Danny's state habeas proceeding that counsel made no objection at trial to the admissibility of the polygraph results because the state had complied with the agreement. We find no constitutional error with regard to the polygraph evidence.

## III. CONCLUSION

Because any constitutional error was either harmless or the subject of a state procedural default,[8] the judgments of the district court denying these petitions for writs of habeas corpus are AFFIRMED.

JOHNSON, Circuit Judge, concurs in judgment:

Although I concur in the ultimate disposition of the issues presented in this case, I write separately to emphasize that the denial of relief should not be interpreted as narrowing the scope or availability of the writ of habeas corpus to relieve state prison inmates from confinement imposed in violation of the dictates of the Constitution.

Chief Justice Hughes once wrote for a unanimous Court, "[i]t must never be forgotten that the writ of habeas corpus is the precious safeguard of personal liberty and there is no higher duty than to maintain it unimpaired." *Bowen v. Johnston,* 306 U.S. 19, 26, 59 S.Ct. 442, 446, 83 L.Ed. 455 (1939). This principle is as true today as it was in 1939. Recent decisions emphasize the propriety and necessity of federal collateral review of the constitutionality of state confinement or restrictions on the liberty of an individual. *See Harris v. Reed,* —— U.S. ——, 109 S.Ct. 1038, 1044, 103 L.Ed.2d 308 (1989) (extending "plain statement" rule of *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), to habeas cases); *Granberry v. Greer,* 481 U.S. 129, 131, 107 S.Ct. 1671, 1673, 95 L.Ed.2d 119 (1987) (reaffirming that "the failure to exhaust state remedies does not deprive an appellate court of jurisdiction to consider the merits of a habeas corpus application."); *Kimmelman v. Morrison,* 477 U.S. 365, 378, 106 S.Ct. 2574, 2585, 91 L.Ed.2d 305 (1986) (refusing to extend *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), to Sixth Amendment habeas claims because "collateral review will frequently be the only

7. The district court found that Gene's claim on this issue is barred by procedural default. We agree. Gene relies on his illiteracy and inability to understand the state proceedings as cause for his default. Because we have already determined that this showing of cause is insufficient, we proceed to a discussion of Danny's claims on this point.

8. Gene also challenges some of the evidentiary rulings of the state trial judge: (1) the admission into evidence of gruesome photographs of the victim; and (2) the exclusion of written statements taken from people who had been in the vicinity of the burglary and murder on the

date of the crimes. "Federal courts reviewing habeas corpus petitions are not empowered to correct erroneous evidence rulings of state trial courts." *Boykins v. Wainwright,* 737 F.2d 1539, 1543 (11th Cir.1984). "State evidentiary claims are only cognizable on federal habeas corpus review if the rulings render the state proceeding fundamentally unfair." *Redman v. Dugger,* 866 F.2d 387, 390 (11th Cir.1989). We hold that any evidentiary error did not render the trial fundamentally unfair. The other issues raised by Gene in his pro se appellate brief but omitted from his appellate lawyer's brief are also without merit.

means through which an accused can effectuate the right to counsel"); *Miller v. Fenton*, 474 U.S. 104, 118, 106 S.Ct. 445, 454, 88 L.Ed.2d 405 (1985) (refusing to extend presumption of correctness under 28 U.S.C. A. § 2254(d) to state court conclusions on voluntariness of confessions because "independent federal review has traditionally played an important parallel role in protecting the rights at stake when the prosecution secures a conviction through the defendant's own admissions").

Federalism concerns make us mindful of important state interests presented in the habeas context, *see Harris*, 109 S.Ct. at 1049, and we recognize the need for finality. *See Teague v. Lane*, — U.S. —, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). However, our primary concern is with protecting the constitutional rights of the individual petitioner. *See Miller*, 474 U.S. at 117–18, 106 S.Ct. at 453–54. I cannot join in language which suggests that federal review of petitions for habeas corpus brought by individuals incarcerated in state prisons is somehow inappropriate, troublesome, or less than "the precious safeguard of personal liberty."

NICHOLS, Senior Circuit Judge, concurring in the result.

1. When accused persons are siblings, as here, or otherwise linked by natural affection, the last thing they may want is a defense in which counsel for each tries to blame a crime on the other. Moreover, a unified defense under a single head may actually be more effective, and separate counsel, each zealously striving to implicate the other's client, may be inimical to both. The budgets of hard-pressed public defenders is also for consideration. The mere possibility that one defendant might turn state's evidence against another is always theoretically present, but it must not be allowed always to preclude the possibility of a unified defense managed in the interests of both. If a plea bargain turning one against the other is a real possibility, and needs to be explored in the interests of either accused, a different situation presents itself. Counsel who, without both client's informed consent, actually negotiates towards such a bargain, violates a constitutional right and the rules of ethics besides. The problem is, when to draw the line, and I do not see how counsel can draw it without some inquiries to inform himself whether the possibility of a plea bargain in the interest of one to the detriment of the other is a real possibility.

As I read *Ruffin v. Kemp*, 767 F.2d 748 (11th Cir.1985), there were actual plea bargain negotiations in which counsel offered client Brown's testimony against client Ruffin. Here a plea bargain was always impossible because neither defendant would implicate the other and both insisted they were not at the scene of the crime at all. Nor would the state consider one with Gene, whom it desired to put to death, as the principal offender. Recognizing as I do that counsel Murphy needed to explore the possibility of a plea bargain enough to know if a constitutional and ethical requirement for separate representation existed, I cannot conclude there was a violation on his part merely because he may have talked about a possible plea bargain with someone and established there could be none. The possibility could not have impaired his performance because he knew, or learned, there was none, only impossibility.

2. The faulty instructions on intent were:

I charge you that the acts of a person of sound mind and discretion are presumed to be the product of his will, but this presumption may be rebutted.

I charge you that a person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts, but this presumption may be rebutted.

That these instructions were faulty is not to be disputed in this court in view of *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), but Danny was not prejudiced because his "felony murder" conviction did not require intent to kill. Moreover, the defense of both was that they were elsewhere and they had no part in killing Bostick. There was no doubt

from the condition of the corpse that whoever killed Bostick did so with intent. The Supreme Court in *Francis v. Franklin* lays great stress on the fact that the accused, admitting he fired the fatal shot, denied he intended to kill. The majority held that intent was clearly in issue and reserved decision on whether "error" in an instruction can ever be "harmless." 471 U.S. at 324, 105 S.Ct. at 1976. As four Justices even so dissented, it is clear the case cannot be read to go beyond its facts. This court has held that error in an instruction about intent can be harmless if intent is not a genuine issue. *Drake v. Kemp*, 762 F.2d 1449 (11th Cir.1985) (en banc). There is no dispute here that if Gene and Danny were the killers, Gene wielded the weapon.

3. I am persuaded the above disposes of the constitutional issues in the case and there is no need to go into all the matters discussed in the court's opinion. I am reluctant to contribute to circuit law more than I need to justify an affirmance, and therefore concur in the result only.