TJOFLAT, Chief Judge:
 

 Petitioner, Jimmie Burden, Jr., is a Georgia prisoner convicted on four counts of murder and sentenced to death on three of those counts. After exhausting his remedies in the Georgia state courts, Burden filed a petition for a writ of habeas corpus in the United States District Court for the Middle District of Georgia, alleging
 
 inter alia
 
 that his trial counsel had a conflict of interest. The district court denied the petition,
 
 see Burden v. Zant,
 
 690 F.Supp. 1040 (M.D.Ga.1988), and Burden appealed. Because the record did not permit this court to evaluate Burden’s conflict-of-interest claim, we remanded the case for an eviden-tiary hearing on that issue alone.
 
 See Burden v. Zant,
 
 871 F.2d 956 (11th Cir.1989). The district court held the evidentiary hearing, made factual findings, and again concluded that Burden had received representation of counsel untainted by conflict of interest. After considering all of Burden’s claims, we affirm the district court’s denial of Burden’s petition for a writ of habeas corpus.
 

 I.
 

 On May 29, 1980, Burden was indicted in Washington County, Georgia, on a charge of burglarizing the home of his sister, Willie Kate Dixon. Burden was arrested on the burglary indictment on August 1, 1981, in Harrington, Delaware. He waived extradition proceedings, and on August 3, 1981, he was returned to Washington County where he was incarcerated pending trial on the burglary charge. He was convicted on that charge in December 1981.
 

 
 *1356
 
 On September 15, 1981, while Burden was awaiting trial on the burglary charge, his nephew, Henry Lee Dixon, gave a statement to the police implicating Burden in the unsolved 1974 murders of Louise Wynn and her three children. Based upon this statement, the state secured warrants charging both Dixon and Burden with the four murders. No indictment was ever returned against Dixon, however: at Dixon’s preliminary hearing, the judge ruled that, while the state had sufficient evidence to hold Dixon as a material witness against Burden, it did not have probable cause to hold him for murder; the state never renewed the murder charges. An indictment was returned against Burden on December 7, 1981, charging him with four counts of malice murder. In March 1982, a Georgia jury found him guilty on each count, and after finding that a statutory aggravating circumstance existed, recommended that he be sentenced to death for each murder.
 
 [1]
 
 On direct appeal, the Georgia Supreme Court affirmed the four murder convictions and three of the death sentences but set aside one death sentence because the conviction for which that sentence was imposed was used as an aggravating circumstance to support the other three sentences.
 
 See Burden v. State,
 
 250 Ga. 313, 297 S.E.2d 242, 245 (1982),
 
 cert. denied,
 
 460 U.S. 1103, 103 S.Ct. 1803, 76 L.Ed.2d 367 (1983).
 

 The district court adopted the Georgia Supreme Court’s summary of the facts leading to Burden’s conviction, and we reproduce that summary as follows:
 

 On the evening of August 15 and morning of August 16, 1974, four bodies were recovered from Smith’s Pond in Washington County, identified as Louise Wynn and her three children, ages 2, 3, and 4. The autopsies revealed that Louise Wynn died from multiple blows to the head; that Marvin, age 4, and James, age 2, died from drowning; and that Melinda, age 3, died from strangulation. Louise was clothed only in an undergarment and a dress torn in half. The crime scene revealed an area of disturbed pine straw, possibly evidencing a struggle. Investigators also discovered there an automobile lug wrench with what appeared to be blood stains.
 

 After extensive investigation, law enforcement officials were unable to fix upon a suspect, and the case was placed in the unsolved file some two years later. In late 1981, Henry Lee Dixon, a nephew of Burden, came forward with information leading to the arrest and indictment of this defendant.
 

 Henry Lee Dixon testified that on August 13, 1974, Burden came to his house and asked to ride to town with him. He then directed Dixon to a liquor store where Burden purchased a case of beer and some liquor. Burden next directed Dixon to drive to Louise Wynn’s house. Burden, who had been drinking heavily all the while, went into the house, and after about 15 minutes returned with two older children, followed by Louise Wynn, who was carrying a baby. Burden told Dixon to drive, while he continued to drink, kissing and hugging Louise Wynn in the back seat. Dixon was then directed to stop along a dirt road leading to Smith’s Pond, where Burden and the four victims got out of the car. Burden took from his car a shotgun, fishing poles and bait, and told Dixon to return later to pick them up. When Dixon returned he saw Burden walking down the road, he stopped and asked where the others were. Burden first said that Louise became angry and had gone to her mother’s house. After Dixon wanted to go and get Louise Wynn, Burden said “he had [messed] up,” that she “didn’t act right” and he “hit her side the head with something” and that “she fell in the pond or he throwed her in the pond one.” Dixon then asked about the children and Burden replied, “I reckon I damn well know where they are at, too.” When Dixon suggested going back to the pond, Burden threatened him with a shotgun if he ever related the event to anyone.
 

 
 *1357
 
 The day after the bodies were discovered, Burden broke a pool cue over Dixon’s head when he saw him talking with others, and again warned him not to mention the events of Tuesday.
 

 Several witnesses testified that Burden and Louise Wynn were keeping social company with each other, having seen them together at various places just pri- or to Louise Wynn’s death.
 

 Two other witnesses testified as to physical assaults and attempted sexual assaults made upon them by Burden at times when he had been drinking. One such witness attributed to Burden the threat: “[H]e told me that he was going to throw me in a pond like he did somebody else.”
 

 Burden v. State,
 
 297 S.E.2d at 243-44.
 

 In his petition for a writ of habeas corpus, Burden presents the following claims for relief: (1) due to his counsel’s conflict of interest, he did not receive effective assistance of counsel, as guaranteed by the sixth, eighth, and fourteenth amendments to the United States Constitution; (2) the state trial court erred in admitting evidence of unrelated bad acts in violation of rights guaranteed by the sixth, eighth, and fourteenth amendments; (3) his trial counsel’s failure to provide effective assistance violated his sixth, eighth, and fourteenth amendment rights; (4) prosecutorial misconduct rendered his trial fundamentally unfair and violated his sixth, eighth, and fourteenth amendment rights; (5) the evidence was not sufficient to support the verdict, in violation of his sixth, eighth, and fourteenth amendment rights; (6) the state trial court erred in giving an inadequate jury instruction on mitigating circumstances which violated his sixth, eighth, and fourteenth amendment rights; and (7) un-derrepresentation of blacks and women in the grand and traverse jury pools, from which his grand jury and petit jury were drawn, violated his sixth, eighth, and fourteenth amendment rights. Because Burden’s first, third, and sixth claims involve the sixth amendment right to effective assistance of counsel, we consider them together.
 
 [2]
 
 We discuss the remaining claims separately.
 

 II. Effective Assistance of Counsel
 

 A.
 

 Burden contends first that he has been denied the effective assistance of counsel because his counsel labored under a conflict of interest. He bases that contention on the allegedly simultaneous representa
 
 *1358
 
 tion of Burden and Henry Dixon by the public defender's office in general and by Burden’s trial counsel in particular. When the case first came to this court, it became evident at oral argument that the record provided no answers to critical questions upon which the parties’ arguments depended. For example, in his brief and at oral argument, Burden relied heavily on the assumption that his attorney, the public defender who was then representing both Burden and Dixon on the same murder charges, put Dixon on the stand at Dixon’s committal hearing
 
 [3]
 
 and elicited testimony inculpating Burden. Burden also relied on the assumption that his attorney had negotiated and obtained transactional immunity for Dixon in exchange for Dixon’s testimony against Burden. Furthermore, the practices of the two-person Public Defender’s Office at the time of Burden’s representation and the relationship of each attorney to Burden and to Dixon were not clear. The facts have now been sufficiently developed, both at the evidentiary hearing on remand and by supplementary filings, to permit us to resolve Burden’s conflict-of-interest contention. After reviewing the elements of an ineffective-assistance-of-counsel claim based on conflict of interest, we set out those facts in some detail.
 

 1.
 

 The sixth amendment right to the effective assistance of counsel entails the right to representation unimpaired by actual conflict of interest on the part of defense counsel.
 
 See Cuyler v. Sullivan,
 
 446 U.S. 335, 349, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980);
 
 Lightbourne v. Dugger,
 
 829 F.2d 1012, 1023 (11th Cir.1987),
 
 cert. denied,
 
 — U.S. -, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988). When analyzing an ineffective-assistance-of-counsel claim, we first ask whether counsel’s performance, measured by professional norms prevailing at the time, was deficient and, if so, whether the deficient performance prejudiced the defendant.
 
 See Strickland v. Washington,
 
 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). In evaluating such a claim based on an alleged conflict of interest, however, the inquiry is abbreviated and prejudice is presumed if — but only if — “the defendant demonstrates that counsel ‘actively represented conflicting interests’ and that ‘an actual conflict of interest adversely affected his lawyer’s performance.’ ”
 
 Strickland,
 
 466 U.S. at 692, 104 S.Ct. at 2067 (quoting
 
 Cuyler,
 
 446 U.S. at 350, 348, 100 S.Ct. at 1719, 1718);
 
 see Burger v. Kemp,
 
 483 U.S. 776, 783, 107 S.Ct. 3114, 3120, 97 L.Ed.2d 638 (1987). We note that multiple representation does not necessarily result in a constitutional violation: where the defendant has not objected to his counsel’s representation of another, he must still show an actual conflict and the adverse effect of that conflict.
 

 2.
 

 We now turn to the facts relevant to Burden’s conflict-of-interest contention. Washington County is one of five counties that make up the Middle Judicial Circuit of Georgia. At the time Burden was returned to Washington County to face the burglary charge, indigent defendants in the circuit were represented by a public defender, Kenneth Kondritzer, and an assistant public defender, Michael Moses. Their representation of an indigent defendant would at times begin after a routine visit to the county jails to see if anyone there needed counsel; at other times, the judges would informally appoint the public defender’s office to represent an indigent defendant at arraignment. Apparently the judges did not enter formal orders and did not designate either Kondritzer or Moses to represent particular defendants. Rather, Kondritzer and Moses divided the cases between them largely on a geographical ba
 
 *1359
 
 sis, with Kondritzer taking the majority of cases in the northern part of the circuit, where Washington County is located, and Moses taking those in the southern part. Although the two attorneys shared an office and a secretary, they handled their cases independently of one another.
 

 Kondritzer was appointed on or about August 3,1981, to represent Burden on the burglary charge.
 
 [4]
 
 On September 15, 1981, the criminal warrants charging Burden with the Wynn murders were issued, and Burden was indicted on those charges on December 7, 1981, one day before his conviction for burglary. The criminal warrants charging Dixon with the same murders were also issued on or about September 15, 1981, and Kondritzer undertook Dixon’s representation on or about the same date. Kondritzer testified at the evi-dentiary hearing in the district court that he could not remember how his representation of Dixon began. There is no doubt, however, that for some period of time Kon-dritzer himself was representing both Burden and Dixon. Whether Burden was aware at that time that Kondritzer was representing Dixon is unclear; it is clear, however, that he did not request the trial court or Kondritzer himself to put an end to the dual representation.
 

 A committal hearing for Dixon was held on November 19,1981 in Washington County. The committal hearing transcript, which evidently became available after the case was argued before us but before the district court’s evidentiary hearing on remand, reveals that Dixon was incarcerated at the time in a different county and that Kondritzer waived his presence. The only witness at the hearing was Chief Deputy Sheriff Mack Rogers, to whom Dixon had made the statement inculpating Burden in the Wynn murders. The judge determined that there was not probable cause to hold Dixon for murder but offered to hold him as a material witness. The State made a verbal motion to that effect, and the judge granted the motion and set bond at $50,-000. Dixon did not post bond and remained in custody until the close of Burden’s trial.
 

 Had the facts been as Burden originally presented them to us, we would have had no difficulty concluding that Kondritzer's representation of Dixon had required him to sacrifice Burden, reflecting an actual conflict and adversely affecting his representation of Burden. It is now apparent, however, that this serious allegation is factually incorrect: Kondritzer, while representing Burden, did not call Dixon to the stand and elicit testimony manifestly prejudicial to Burden. Kondritzer’s representation of Dixon at Dixon’s committal hearing consisted of brief cross-examination that in no way damaged Burden, argument that there was no probable cause to hold Dixon, and opposition to the material witness bond set to ensure Dixon’s
 
 presence
 
 — and
 
 testimony prejudicial to Burden
 
 — at Burden’s trial. Thus, while there was a potential conflict of interest — which no doubt would have materialized had Kondritzer
 
 continued
 
 to represent both Burden and Dixon— all charges against Dixon were dropped, and the conflict never became actual in the sense that Kondritzer’s representation of Dixon’s interests required him to compromise Burden’s interests.
 
 See Stevenson v. Newsome,
 
 774 F.2d 1558, 1562 (11th Cir.1985), ce
 
 rt. denied,
 
 475 U.S. 1089, 106 S.Ct. 1476, 89 L.Ed.2d 731 (1986).
 

 Similarly, the assumption that Dixon received a grant of transactional immunity, negotiated by Kondritzer and the prosecutor in exchange for Dixon’s testimony against Burden, is without factual support. The source of Burden’s impression that Dixon was granted immunity appears to have been Dixon’s testimony at Burden’s
 
 *1360
 
 trial: under cross-examination, Dixon stated that two deputy sheriffs, interrogating him on the Wynn murders, had promised that he would not be prosecuted if he testified truthfully against Burden; Dixon stated that he understood, from these promises, that he had “immunity.”
 
 [5]
 
 But according to then Chief Assistant District Attorney Richard Malone, who prosecuted Burden, transactional immunity, if and when granted to a witness, was the result of a formal, signed agreement between the district attorney, the witness, and the witness’s attorney. There is no documentary evidence of any sort that attests to Dixon’s having received immunity, and Malone testified at the district court evidentiary hearing that he did not recall any such agreement concerning Dixon. Furthermore, Malone remembered no negotiations with Kon-dritzer (or any other attorney) concerning immunity for Dixon. Kondritzer testified at the district court evidentiary hearing that, after the committal hearing, he had informal discussions with Malone, which Kondritzer remembered as resulting in his “understanding” that the State was not “really interested in prosecuting Dixon” in connection with the Wynn deaths as long as Dixon testified against Burden. The impression of a witness that he would not be prosecuted as long as he testified does not establish a grant of immunity — formal or informal. And informal discussion that results in a defense attorney’s understanding of the prosecution’s current intentions is not negotiation of immunity. As the district court concluded, “there is [no] evidence of transactional immunity being granted to Henry Lee Dixon”; additionally, there is no evidence of any negotiations concerning immunity. Thus, Burden can no longer base his conflict-of-interest claim on the mistaken assumption that the attorney representing him obtained or attempted to obtain immunity for one client in exchange for testimony that was instrumental in the conviction of another.
 

 Burden further alleges, with respect to his conflict-of-interest claim, that his trial counsel, Moses, continued actively to represent Dixon while Dixon was being held as a material witness for the prosecution; he also argues that, even if Moses never actively represented Dixon, Kondrit-zer’s representation of Dixon must be imputed to Moses as a member of the same public defender’s office. We assume without deciding that two attorneys in the same public defender’s office may be considered one attorney,
 
 see Burger,
 
 483 U.S. at 783, 107 S.Ct. at 3120, and nonetheless perceive no actual conflict of interest adversely affecting Moses’ performance.
 

 The record developed at the evidentiary hearing indicates that Kondritzer, who represented Dixon while the murder charges were pending against him, resigned from the public defender’s office in late December 1981, after Burden’s burglary conviction and before his arraignment on the murder charges; we have already concluded that the potential conflict of interest lurking in Kondritzer’s continued representation of Dixon and Burden on the same murder charges never materialized because the charges against Dixon were dropped. During the time that both attorneys were still in the public defender’s office, Kondrit-zer and Moses did not jointly participate in either the Burden or the Dixon case. The district court found that up to the point of Kondritzer’s departure “Mr. Moses had not represented petitioner as to either his burglary charge or his murder charges; neither had Mr. Moses assisted Mr. Kondrit-zer in any way in his representation of petitioner. Mr. Moses also had not represented nor assisted Mr. Kondritzer in representing Henry Lee Dixon.” Nothing in the record causes us to question those findings.
 

 Upon Kondritzer’s departure, Moses became public defender and took over Burden’s defense, a defense that required Moses to attack Dixon’s testimony. The district court found that, in the course of preparing for Burden’s murder trial, Moses interviewed Dixon — who was being held in county jail under the material witness bond — for the first time. Then, at trial, Moses vigorously cross-examined Dixon,
 
 *1361
 
 based in part on that interview. At the conclusion of Dixon’s testimony, Moses opposed the prosecutor’s motion that the material witness warrant against Dixon be dissolved. Moses’ conduct is consistent with his recollection, expressed in testimony at the evidentiary hearing in the district court, that he did not represent Dixon in any way. In holding that Moses did not labor under an actual conflict of interest, the district court implicitly found that Moses himself did not represent Dixon before
 
 or after
 
 Kondritzer’s departure. There is nothing in the record to suggest the contrary.
 

 Assuming that Kondritzer’s past representation of Dixon is imputed to Moses, a conflict of interest arose, for “[a]n attorney who cross-examines a former client inherently encounters divided loyalties.”
 
 Lightbourne,
 
 829 F.2d at 1023. Given Moses’ conduct, however, even if a conflict of interest arose from his representation of a client previously represented by the same public defender’s office,
 
 see id.
 
 at 1024, we perceive no adverse effect upon his representation of Burden. The district court found that
 

 Mr. Moses brought out evidence of Dixon’s bad character; he inquired into the fact that Mr. Dixon had once been charged with the same crimes alleged against Mr. Burden, and [Dixon’s understanding] that as a result of his testimony he was not going to be prosecuted; he cross-examined Mr. Dixon about being in custody under a material witness bond; he brought out prior inconsistent statements made by Mr. Dixon; and he generally attempted to discredit Dixon’s testimony.
 

 Like the district court, we perceive no issues that were not brought out by Moses that another attorney might have developed. Accordingly, we reject Burden’s contention that Moses’ presumed conflict of interest, based on Kondritzer’s previous representation of Dixon, adversely affected Moses’ representation of Burden.
 

 Because Burden has demonstrated no actual conflict of interest adversely affecting counsel’s performance, we hold that no such conflict deprived him of the effective assistance of counsel.
 

 B.
 

 Burden also contends that he did not receive effective assistance of counsel because Moses was inexperienced, overworked, did not sufficiently investigate the case, did not present mitigating evidence at sentencing, and did not challenge the composition of the grand and traverse jury pools.
 

 Under the familiar two-part inquiry into ineffective-assistance-of-counsel claims, we first ask whether counsel’s performance was deficient.
 
 See Strickland,
 
 466 U.S. at 687, 104 S.Ct. at 2064. If so, we then determine whether the deficient performance prejudiced the defendant.
 
 Id.,
 
 104 S.Ct. at 2064. The standard for measuring deficient performance is an objective one: ‘‘reasonableness under prevailing professional norms.”
 
 Id.
 
 at 688, 104 S.Ct. at 2065. Furthermore, a reviewing court’s scrutiny of counsel’s performance should be highly deferential.
 
 Id.
 
 at 689-90, 104 S.Ct. at 2065-66 (there is “strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance”; defendant must overcome presumption that challenged action “might be considered sound trial strategy”).
 

 We note first that inexperience does not constitute ineffectiveness per se: a defendant who relies on allegations of counsel’s inexperience in support of an ineffective-assistance-of-counsel claim must still make the two-part showing of deficient performance and prejudice.
 
 See United States v. Cronic,
 
 466 U.S. 648, 665, 104 S.Ct. 2039, 2050, 80 L.Ed.2d 657 (1984). After reviewing Moses’ performance as Burden’s attorney, we conclude that his representation of Burden did not fall below the objective standard of reasonableness articulated in
 
 Strickland.
 

 Moses testified at the state habeas court’s evidentiary hearing that he had adequate time to investigate Burden’s case and to prepare his defense. That Moses did not interview all of the persons now
 
 *1362
 
 suggested as potential witnesses does not mean that his investigation was inadequate. Moses interviewed all of the state’s witnesses that he could locate, the original investigating agents of the Georgia Bureau of Investigation and of Washington County, at least one of Burden’s former employers, friends of Louise Wynn, and members of Burden’s family, including his mother, grandmother, sisters, and a nephew. It was evident by then — due to the eight-year time lapse, faulty memories of those interviewed, and Burden’s own inability to remember his whereabouts on the day of the murders — that no alibi witnesses could be found by further investigation. In the course of his investigation, Moses visited the home of Burden’s grandmother several times. Contrary to Burden’s assertion, Moses’ investigation provided him with considerable information about Burden's upbringing and lack of education. Moses did not fail to present such evidence at the sentencing hearing because he was unaware of it; rather, according to Moses’ testimony at the district court evidentiary hearing, he made a tactical decision not to emphasize Burden’s background because it was so similar to that of many persons in the area.
 

 Burden also complains that Moses failed to present sympathetic character witnesses. At the guilt phase of the trial, Moses decided to call no character witnesses for fear that the State would counter by presenting evidence of Burden’s prior convictions. At the sentencing phase, he chose not to mention Burden’s good behavior in prison because of the risk that introduction of prison records would do more harm than good. Although he considered calling Burden’s mother and sisters to present mitigating evidence at the sentencing phase, he decided against the tactic. He specifically recalled that Burden’s mother would not have made a presentable witness. Further, Burden had just been convicted of burglarizing the home of one sister. Even assuming that the family would have testified sympathetically to Burden (which is not at all certain given the burglary and a violent sexual attack upon his sister,
 
 see infra
 
 part III), damaging information about the burglary conviction could have been revealed to the jury through cross-examination. Surely Moses’ decisions with respect to calling witnesses and presenting evidence, based as they were on information gathered through considerable investigation, are the sort of judgment calls that
 
 Strickland
 
 cautions us not to second-guess.
 

 Finally, Burden contends that Moses rendered ineffective assistance by failing to challenge the 1981 Washington County grand and traverse jury pools from which his grand and traverse juries were drawn. As we have previously stated, however, “[t]he sixth amendment right to effective assistance of counsel does not require counsel to raise every objection without regard to its merits.”
 
 Palmes v. Wainwright,
 
 725 F.2d 1511, 1523 (11th Cir.),
 
 cert. denied,
 
 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984). Moses testified at the state habeas corpus hearing that he did not consider a jury-composition challenge feasible at the time: he was familiar with the black-white ratios on the jury pools and considered them to be in line with the black-white ratio of the population at large. Malone, the prosecutor in Burden’s case, confirmed this assessment, testifying that, although he had never figured exact percentages, he too remembered that the racial composition of the jury pools in 1981 generally approximated the racial composition of the population.
 

 In support of his assertion that Moses should have challenged the composition of the jury pools, Burden presents an affidavit from Kondritzer stating that perceived discrepancies in the 1983 jury pools had prompted him to bring a challenge. Burden also attaches to his federal habeas petition a 1984 consent agreement, wherein Washington County jury commissioners agreed to revise the jury lists but did not admit discrimination, and a 1983 court order directing the county to revise its jury lists but specifically declining to find that the jury composition was discriminatory. These documents reveal that there were jury-composition disputes in 1983 and suggest, at best, that Moses might have generated a similar dispute in 1981. They do
 
 *1363
 
 not, however, indicate that Moses would have succeeded nor that he made an unreasonable decision when he determined that such a challenge was not feasible. A reviewing court must evaluate counsel’s performance based on what counsel knew or should have known at the time rather than on hindsight,
 
 see Strickland,
 
 466 U.S. at 689-90, 104 S.Ct. at 2065-66. Burden has failed to demonstrate that professional standards prevailing at the time required Moses to challenge the composition of the 1981 jury pool.
 
 [6]
 

 In sum, after reviewing Burden’s allegations of ineffective assistance of counsel, we agree with the district court that Moses’ representation of Burden did not fall below an objective standard of reasonableness.
 

 III. Admission of Extrinsic-Acts Evidence
 

 Burden contends that the trial court erred in admitting into evidence two “bad acts,” unrelated to the offenses with which he was charged. The challenged evidence is the testimony of Willie Kate Dixon (Burden’s sister) and Betty Jean Darrisaw (who had dated Burden at one time). After a hearing conducted outside the presence of the jury, each witness was allowed to testify that Burden had once violently assaulted her when she refused to have intercourse with him; Burden had been drinking heavily on both occasions. Each incident occurred some six or seven years after the murder of Louise Wynn. Before allowing the testimony of each witness, the trial court instructed the jury to consider it not as direct evidence of Burden’s involvement in the Wynn murders but only insofar as it might show “motive or plan or scheme or bent of mind or course of conduct.” Burden argues that the incidents were too distant in time and too dissimilar in circumstance to have any relevance with respect to motive, plan, scheme, bent of mind, or course of conduct.
 

 For a state court evidentiary ruling to merit federal habeas corpus relief, the ruling must have deprived the petitioner of fundamental fairness, thereby denying him due process of law.
 
 See Williams v. Kemp,
 
 846 F.2d 1276, 1281 (11th Cir.1988),
 
 cert. denied,
 
 — U.S. -, 110 S.Ct. 1836, 108 L.Ed.2d 965 (1990);
 
 Jameson v. Wainwright,
 
 719 F.2d 1125, 1126 (11th Cir.1983),
 
 cert. denied,
 
 466 U.S. 975, 104 S.Ct. 2355, 80 L.Ed.2d 827 (1984). We note, preliminarily, that on direct appeal the Georgia Supreme Court expressly ruled that the evidence was relevant under Georgia law and was properly admitted,
 
 [7]
 

 see Burden v. State,
 
 297 S.E.2d at 244, a state-law determination that this court must respect,
 
 see Amadeo v. Kemp,
 
 816 F.2d 1502, 1504 (11th Cir.1987),
 
 rev’d on other grounds sub nom. Amadeo v. Zant,
 
 486 U.S. 214, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988). Thus, Burden cannot complain that he was deprived of fundamental fairness by the trial court’s erroneous application of state law.
 

 The correctness of the ruling under Georgia law does not, of course, preclude this court from granting habeas corpus relief if the ruling was so fundamentally unfair as to deprive Burden of his federal
 
 *1364
 
 constitutional right to the due process of law.
 
 See Manning v. Rose,
 
 507 F.2d 889, 892 (6th Cir.1974). We do not, however, consider the admission of the extrinsic-acts evidence a violation of federal due process. We have construed the due process clause as “permitting the states wide latitude in fashioning rules of evidence.”
 
 Bassett v. Smith,
 
 464 F.2d 347, 351 (5th Cir.1972),
 
 [8]
 

 cert. denied,
 
 410 U.S. 991, 93 S.Ct. 1509, 36 L.Ed.2d 190 (1973);
 
 see Lisenba v. California,
 
 314 U.S. 219, 227, 62 S.Ct. 280, 286, 86 L.Ed. 166 (1941) (“Fourteenth Amendment leaves [a state] free to adopt a rule of relevance ... ”). In
 
 Lisenba,
 
 where the petitioner claimed that the admission of testimony concerning the drowning of his former wife denied him due process of law in his trial on charges of drowning his later wife, the Supreme Court approved specifically the admission of extrinsic-acts evidence to show motive, plan, scheme, and course of conduct.
 
 Id.,
 
 62 S.Ct. at 286. Although the extrinsic incident at issue in
 
 Lisenba
 
 did not result in a conviction or even in criminal charges, the Court sustained the state trial court’s admission of the evidence because of “the widely recognized principle that similar but disconnected acts may be shown to establish intent, design, and system.”
 
 Id.,
 
 62 S.Ct. at 286;
 
 see United States v. Beechum,
 
 582 F.2d 898, 910 (5th Cir.1978) (en banc),
 
 cert. denied,
 
 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979).
 

 Burden correctly asserts that a state cannot adopt a rule of evidence that permits the introduction into evidence of
 
 any
 
 prior act with some bearing, however tenuous, on proof of motive, plan, scheme, bent of mind, or course of conduct.
 
 See Manning,
 
 507 F.2d at 894 (“To be consistent with due process, the other crime must be ‘rationally connected’ with the charged crime.”). Burden claims that the extrinsic acts admitted into evidence at his trial were too distant in time and too dissimilar in circumstance to be rationally connected to the Wynn murders. We disagree. Under both federal and Georgia law, a long lapse of time between the extrinsic act and the charged crime does not render the former inadmissible if the acts are sufficiently similar to establish the necessary rational connection.
 
 See United States v. Terebecki,
 
 692 F.2d 1345, 1349 (11th Cir.1982);
 
 Campbell v. State,
 
 234 Ga. 130, 214 S.E.2d 656, 658 (1975). In this case, the two witnesses testified that (1) Burden had been drinking heavily, (2) the assaults followed their refusal to have sexual relations with him, and (3) the assaults involved attempted rape. Dixon testified that Burden had been drinking heavily on the day of the Wynn murders and that Burden, who had been kissing and hugging Louise Wynn in the car, said later that Wynn “didn’t act right.” Louise Wynn’s body was clad only in an undergarment and a dress torn in half and was surrounded by evidence of a struggle. There is a sufficient similarity between the Willie Dixon and Darrisaw incidents and the circumstances surrounding Louise Wynn’s death to establish a rational connection tending to prove motive, bent of mind, or course of conduct. We therefore hold that the admission of the extrinsic-acts evidence did not render Burden’s trial fundamentally unfair and thus did not deny him the due process of law.
 

 IV. Prosecutorial Misconduct
 

 Burden claims that certain statements made by the prosecutor in closing argument at the sentencing phase were so improper as to deprive him of due process. He alleges specifically that (1) in alluding to the widespread publicity and community anger engendered by the Wynn murders, the prosecutor referred to matters not in evidence and improperly attempted to incite the jury; (2) the prosecutor used the race of the victim to support his plea for a death sentence; and (3) the prosecutor made an improper appeal to the patriotism and bravery of the jury.
 
 [9]
 

 
 *1365
 
 In
 
 Brooks v. Kemp,
 
 762 F.2d 1383, 1400 (11th Cir.1985) (en banc),
 
 vacated,
 
 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986),
 
 reinstated on remand,
 
 809 F.2d 700 (11th Cir.) (en banc) (per curiam),
 
 cert. denied,
 
 483 U.S. 1010, 107 S.Ct. 3240, 97 L.Ed.2d 744 (1987), this court articulated the standard for reviewing prosecutorial arguments made at the sentencing phase of a capital trial.
 
 Proper
 
 prosecutorial argument, “no matter how ‘prejudicial’ or ‘persuasive,’ can never be unconstitutional,”
 
 id.
 
 at 1403, and even improper statements will not warrant habeas relief unless they render the sentencing proceeding fundamentally unfair,
 
 id.
 
 at 1400 (citing
 
 Donnelly v. DeChristoforo,
 
 416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974));
 
 see Williams,
 
 846 F.2d at 1283 (when making fundamental unfairness determination, court “ask[s] whether there is a ‘reasonable probability’ that, but for the prosecutor’s offending remarks, the outcome of the sentencing hearing would have been different”).
 

 In this case, we do not reach the “fundamental unfairness” inquiry, because the prosecutorial statements challenged by Burden were not improper. We consider each statement in turn.
 

 A.Reference to Publicity and Community Anger
 

 Contrary to Burden’s assertion, the prosecutor’s reference to widespread publicity was to a matter in evidence: Washington County Sheriff J. Euree Curry had testified that the case had been highly publicized. Although there was no record evidence regarding community feeling, the reference to community anger was permissible: the jurors were members of the community and would know what the community reaction was.
 
 See Brooks,
 
 762 F.2d at 1408 (“Although there was no record evidence on the crime rate, the reference was acceptable because the increase in crime is ‘within the common knowledge of all reasonable people.’ ” (quoting
 
 Tenorio v. United States,
 
 390 F.2d 96, 99 (9th Cir.) (prosecutorial reference to destruction and waste caused by heroin use acceptable as common knowledge),
 
 cert. denied,
 
 393 U.S. 874, 89 S.Ct. 169, 21 L.Ed.2d 145 (1968))). Thus we hold that neither reference was improper.
 

 B.Reference to the Victims’ Race
 

 Burden argues that the prosecutor improperly alluded to the race of the victims to support his request for the death penalty. Burden bases his challenge on the following remarks:
 

 A young black lady and three black children thrown into a pond. In times past, perhaps that would not have been quite as serious to a lot of people in this county. That’s regrettable to have to say. Some people wouldn’t have treated that very harshly in times past, and I find that, and I’m sure you do, repugnant.
 

 Not every allusion to the race of the victim is improper,
 
 see Brooks,
 
 762 F.2d at 1409 (prosecutorial mention of facts about victim, properly developed at trial, acceptable at sentencing; victim need not remain an abstraction). Rather, we must consider the context of the prosecutor’s remark.
 
 See id.
 
 In this case, we note first that the race of the victims was a matter of record evidence. Second, the record discloses that the prosecutor was arguing the absence of mitigating circumstances. We agree with the State’s assessment of the prosecutor’s statement as an appeal to the jury
 
 not to let itself be swayed by the race of the victims
 
 rather than as an impermissible appeal to the jury’s sympathy for the victims on account of their race. We hold that the reference to the race of the victims was not improper.
 

 C.Appeal to the Jury’s Patriotism and Bravery
 

 The prosecutor concluded his argument by reminding the jury of the strength and courage of Americans, including those who had gone to war, in standing up to
 
 *1366
 
 “forces of evil.” He urged the jury to do the same by selecting the death penalty and sending the message that Burden’s crime would not be tolerated by this society. Burden argues that this statement compares a juror’s duty to select the death penalty to a soldier’s duty to kill the enemy, a comparison held to be impermissible in
 
 Brooks. See id.
 
 at 1412. We cannot agree. Unlike the “war on crime” speech decried in
 
 Brooks
 
 (where the prosecutor implied that the jury, like a soldier under orders to kill, had no choice but to select death), the prosecutor’s speech in Burden’s case focused on deterrence, which is a legitimate justification for the death penalty.
 
 See Gregg v. Georgia,
 
 428 U.S. 153, 184-87, 96 S.Ct. 2909, 2930-31, 49 L.Ed.2d 859 (1976);
 
 Brooks,
 
 762 F.2d at 1412 (“Arguments about general or special deterrence may be considered by the jury.”).
 

 In sum, we agree with the district court that the challenged prosecutorial statements do not warrant habeas relief.
 

 V. Insufficient Evidence
 

 Burden claims that there was insufficient evidence to support his conviction and that his right to due process was therefore violated. To satisfy the constitutional requirement of due process in a criminal trial, the state must prove beyond a reasonable doubt every fact that constitutes an essential element of the crime charged against the defendant.
 
 In re Winship,
 
 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). When considering the sufficiency of the evidence on review, the proper inquiry is not whether the reviewing court itself believes that the evidence established guilt beyond a reasonable doubt but “whether, after viewing the evidence in the light most favorable to the prosecution,
 
 any
 
 rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.”
 
 Jackson v. Virginia,
 
 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).
 

 The elements of malice murder, with which Burden was charged, are as follows:
 

 (a) A person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being.
 

 (b) Express malice is that deliberate intention unlawfully to take the life of another human being which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart.
 

 Ga.Code Ann. § 16-5-1 (1982).
 

 The following evidence was adduced at Burden’s trial. Louise Wynn died of multiple blows to the head. Two of the children were drowned, and one died from strangulation. There was evidence of a struggle. According to the testimony of Henry Dixon, Dixon drove Burden, who had been drinking heavily, and the four victims to a pond and left them there. He returned two hours later and found Burden alone, walking away from the pond. When questioned about the others, Burden replied that he had “f — ed up,” had hit Louise Wynn on the head, and that she had fallen in the pond or that he had thrown her in. Burden added that he knew where her children were as well. He warned Dixon not to mention these events, threatening Dixon first with a shotgun, then breaking a pool cue over Dixon’s head several days later when he saw Dixon talking to others. Three other witnesses testified that Burden and Louise Wynn had been dating and that they had seen Louise Wynn beaten during that period. Two witnesses testified that they had been violently assaulted by Burden, who was intoxicated on each occasion, after they had refused to have sex with him; one of these witnesses also testified that Burden had threatened her and told her that he would throw her into a pond as he had thrown someone else. Reviewing this evidence in the light most favorable to the prosecution, we are satisfied that it was sufficient to permit a rational trier of fact to find beyond a reasonable doubt, with respect to each victim, all elements constituting the crime of malice murder.
 

 
 *1367
 
 VI. Improper Jury Instruction
 

 Burden claims that the jury instruction at the penalty phase of his trial failed to guide and focus the jury’s consideration of mitigating circumstances, as required by the eighth and fourteenth amendments. Burden relies on
 
 Moore v. Kemp,
 
 809 F.2d 702, 731 (11th Cir.) (en banc) (eighth and fourteenth amendments require trial court to instruct jury clearly and explicitly on mitigating circumstances and on jury’s option to recommend against death penalty),
 
 cert. denied,
 
 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987), and on
 
 Peek v. Kemp,
 
 784 F.2d 1479 (11th Cir.) (en banc),
 
 cert. denied,
 
 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986), where this court considered the adequacy of a jury instruction on mitigating circumstances. We explained in
 
 Peek,
 
 however, that the focus of a reviewing court’s inquiry is “whether there is a reasonable possibility that the jury understood the instructions in an unconstitutional manner,”
 
 id.
 
 at 1489 (citing
 
 Francis v. Franklin,
 
 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985)), and we held that an instruction on mitigation is constitutionally sufficient “if it is clear from the entire charge considered in context that a reasonable jury could not have misunderstood the nature and function of mitigating circumstances,”
 
 id.
 
 at 1494.
 

 The Constitution permits a jury to impose a sentence of life imprisonment even in the face of aggravating circumstances,
 
 see Gregg v. Georgia,
 
 428 U.S. at 197-98, 96 S.Ct. at 2936-37, and requires a jury to consider
 
 any
 
 evidence in mitigation,
 
 see Lockett v. Ohio,
 
 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). After reviewing the entire charge given to the jury at the sentencing phase of Burden’s trial, we are satisfied that it would fully apprise any reasonable juror of the function of aggravating and mitigating circumstances, the jury’s role in evaluating mitigating circumstances, and its option to recommend against the death penalty.
 
 [10]
 
 We therefore reject Burden’s contention that the instruction was constitutionally inadequate.
 

 VII.
 

 For the foregoing reasons, the district court’s denial of the petition for a writ of habeas corpus is
 

 AFFIRMED.
 

 [1]
 

 . Under Georgia law, the jury’s sentencing recommendation is binding on the trial court, which actually sentences the defendant.
 
 See
 
 Ga.Code Ann. § 17-10-31 (1982).
 

 [2]
 

 . Burden brought the jury-composition claim for the first time in his state habeas action. Because Georgia law requires a criminal defendant to raise a challenge to jury lists at the time the jury is "put upon him,”
 
 see Young v. State,
 
 232 Ga. 285, 286, 206 S.E.2d 439, 442 (1974), and because Burden failed to show cause (and prejudice) so as to excuse the default,
 
 see
 
 Ga. Code Ann. § 9-14-42(b) (1982), the state habeas court ruled that the claim was procedurally defaulted. The court stated that Burden’s allegation that his counsel was ineffective for failing to bring a jury-composition challenge was the only contention that might have satisfied the "cause" requirement and that the issue had already been decided against Burden.
 

 Both in his petition to the district court below and in his appellate brief to this court, Burden repeated his jury-composition claim verbatim in his introductory statement of issues. He did not challenge the state court’s ruling that the claim was procedurally defaulted, however, and his argument referred both the district court and this court to his ineffective-assistance-of-counsel claim for discussion of the allegedly unconstitutional jury composition.
 

 Under federal habeas law, "[bjefore we can hear the merits of his jury composition challenge ..., [Burden] must show cause for his failure to raise the challenge before the trial court and actual prejudice from that failure.”
 
 Birt v. Montgomery,
 
 725 F.2d 587 (11th Cir.) (en banc) (citing
 
 Francis v. Henderson,
 
 425 U.S. 536, 542, 96 S.Ct. 1708, 1711, 48 L.Ed.2d 149 (1976)),
 
 cert, denied,
 
 469 U.S. 874, 105 S.Ct. 232, 83 L.Ed.2d 161 (1984);
 
 see also Engle v. Isaac,
 
 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982);
 
 Wainwright v. Sykes,
 
 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). As in
 
 Birt,
 
 Burden "has presented only one arguably meritorious contention to satisfy the cause element of the
 
 Francis v. Henderson
 
 analysis; that is, that his trial counsel failed to investigate properly and timely challenge the [grand or] traverse jury composition and therefore rendered ineffective assistance of counsel.”
 
 Birt,
 
 725 F.2d at 597. Thus, Burden’s contention that the jury pools were unconstitutionally composed collapses into his contention that his counsel rendered ineffective assistance by failing to bring a jury-composition challenge at the proper time.
 
 See Lancaster v. Newsome,
 
 880 F.2d 362, 375-76 (11th Cir.1989);
 
 Birt,
 
 725 F.2d at 597.
 

 [3]
 

 . Under Georgia law, an accused being held in custody prior to indictment may demand a preliminary hearing, often termed a "committal hearing,” for the purpose of determining whether there exists probable cause to believe that the accused committed the charged crime and, if so, whether the accused should be detained until a grand jury considers his case.
 
 See
 
 Ga.Code Ann. § 17-7-23(a) (1982);
 
 First Nat'l Bank & Trust Co. v. State,
 
 137 Ga.App. 760, 224 S.E.2d 866,
 
 aff'd,
 
 237 Ga. 112, 227 S.E.2d 20 (1976);
 
 see also Fleming v. Kemp,
 
 748 F.2d 1435, 1439 n. 14 (11th Cir.1984),
 
 cert. denied,
 
 475 U.S. 1058, 106 S.Ct. 1286, 89 L.Ed.2d 593 (1986).
 

 [4]
 

 . The trial judge prepared a post-trial report, in keeping with Georgia’s Unified Appeal Procedure established to protect a defendant’s rights, reduce the possibility of error, and eliminate superfluous issues in death penalty cases,
 
 see
 
 Ga.Code Ann. § 17-10-36. The report indicated that Kondritzer began representing Burden on the
 
 murder
 
 charges on August 3, 1981, the date of Burden’s return to Washington County under indictment for burglary. It is apparent that the trial judge confused the two unrelated cases: Burden was not then a suspect in the Wynn cases; he was not charged with the murders until September 15, 1981 and was not indicted on the murder charges until December 7, 1981.
 

 [5]
 

 . Dixon also stated that he did not really know what immunity meant.
 

 [6]
 

 . We note, furthermore, that even if we were to assume that a challenge to the composition of the traverse jury pool would have succeeded and would have made more black jurors available to serve at Burden’s trial, Burden has not shown that Moses performed deficiently in deciding to proceed to trial without a challenge. Burden’s brief to this court cites Moses as testifying that a jury with more black jurors would have been favorable to Burden, who is black himself. We have reviewed Moses’ testimony, however, and it is obvious that Moses was making the general point that, given the jury’s verdict and death sentence recommendation,
 
 any
 
 change in the actual jury selected could only have benefitted Burden. With respect to black jurors in particular, the prosecutor testified that at the time of the trial there was such great hostility toward Burden in the black community that he, the prosecutor, welcomed the presence of black persons on the jury.
 

 [7]
 

 . After laying out the prerequisites for admitting evidence of independent crimes under state law, the Georgia Supreme Court held that, in Burden's case, "[t]he two transactions were sufficiently similar to show identity, motive, plan, scheme, bent of mind and course of conduct, and the trial court did not err in admitting testimony concerning them.”
 
 Burden v. State,
 
 297 S.E.2d at 244.
 

 [8]
 

 . In
 
 Bonner v. City of Prichard,
 
 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.
 

 [9]
 

 . Burden also complains that the prosecutor misled the jury, with respect to its duty to make a separate and specific finding of a statutory aggravating circumstance, by suggesting that because it had already found Burden guilty of the
 
 *1365
 
 four murders, it had also found the aggravating circumstance of murder committed while engaged in the commission of another capital offense. We have reviewed the prosecutor’s argument and find no such improper suggestion.
 

 [10]
 

 . The trial court told the jury it was to consider each of the four murders separately, and the court read the statutory aggravating circumstance
 
 (to wit:
 
 defendant committed the murder while engaged in the commission of another capital felony) sought by the State in connection with each murder. The court then informed the jury as follows:
 

 Now, members of the jury, even if you find beyond a reasonable doubt that the State has proven the existence of the circumstance in each murder, .,. you nonetheless are not required to recommend that the accused be put to death for that murder.
 

 You shall consider any mitigating circumstances. Mitigating circumstances are those circumstances which in fairness and mercy shall be considered by you in fixing punishment.
 

 You may, if you see fit, and this is a matter entirely within your discretion, provide for a life sentence for the accused in any or all murders based upon any mitigating circumstance or reason satisfactory to you, or without any reason, if you see fit to do so. You may recommend life imprisonment even though you have found the aggravating circumstance given to you in this charge for each murder to have existed beyond a reasonable doubt.
 

 The sentences to be imposed in these cases are a matter entirely within your discretion. You may provide for life sentences for this accused for any reason that is satisfactory to you or without any reason if you care to do so_ You may find the aggravating circumstance in your opinion is sufficiently substantial to call for the imposition of the death penalty and even so your verdicts may be for a life imprisonment.