Jimmie BURDEN, Jr., Petitioner–Appellant,

v.

Walter ZANT, Warden, Georgia Diagnostic and Classification Center, Respondent–Appellee.

No. 88–8619.

United States Court of Appeals, Eleventh Circuit.

June 15, 1994.

Millard Farmer, Joseph M. Nursey, Atlanta, GA, John H. Blume, S.C. Death Penalty Resource Center, Columbia, SC, for appellant.

Paula K. Smith, Mary Beth Westmoreland, Office of the Atty. Gen., Atlanta, GA, for appellee.

Before TJOFLAT, Chief Judge, ANDERSON, Circuit Judge, and FAY, Senior Circuit Judge.

ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES

TJOFLAT, Chief Judge:

Jimmie Burden, Jr., is a Georgia prison inmate who was convicted in 1982 of four counts of murder for slaying a mother and her three young children; he was sentenced to death on three of those counts. After exhausting direct appeals in the Georgia state courts, Burden filed a petition for a writ of habeas corpus in the United States District Court for the Middle District of Georgia pursuant to 28 U.S.C. § 2254 (1988), seeking vacation of his convictions and his death sentences. Burden alleged, *inter alia,* that his pretrial counsel's representation was tainted by an unconstitutional conflict of interest. Specifically, Burden alleged that his counsel, while representing both him and his nephew, Henry Lee Dixon, in connection with the same crimes, negotiated transactional immunity for Dixon, who then testified as the principal witness against Burden at trial.

Burden's case has wound its way through the federal courts for over six years. Indeed, this is the fourth occasion on which this court has considered his conflict of interest claim, and this is the second time we have addressed this case on remand from the United States Supreme Court. At issue in all of these federal court decisions has been whether the record revealed that Dixon, while represented by Burden's pretrial counsel, was granted some form of informal immunity from prosecution in exchange for his testimony. The Supreme Court has now answered that question in the affirmative, however, and the terms of the Court's most recent mandate compel our conclusion: by negotiating an informal immunity agreement for Dixon, Burden's counsel labored under an actual conflict of interest that prejudiced his defense. Accordingly, we vacate the judgment of the district court denying Burden's petition for a writ of habeas corpus and remand the case with the instruction that the district court issue the writ.

I.

The factual background of this case has been described extensively in the prior opin-

ions of this court and by the Georgia Supreme Court,[1] but we begin by briefly sketching the relevant events. On August 1, 1981, police officers in Delaware arrested Burden on a charge of burglarizing his sister's home in Washington County, Georgia. Burden waived extradition proceedings and was soon returned to Washington County, where he was incarcerated pending trial on the burglary charge. Shortly thereafter, the state trial court appointed Kenneth Kondritzer, the public defender for the Middle Judicial Circuit of Georgia (which encompassed Washington County), to represent Burden. Burden went to trial on the burglary charge and was convicted in December of 1981.

On or about September 15, 1981, while Burden was still awaiting trial on the burglary charge, Dixon (the son of the alleged burglary victim) gave a statement to the police implicating Burden in the unsolved 1974 murders of Louise Wynn and her three children, all of whom were less than four years old when they were killed.[2] At the time of the murders, law enforcement officials had been unable to locate a suspect after an extensive investigation. Based upon Dixon's statement, however, the State secured warrants charging both Burden and Dixon with the four murders and arrested both men. The court appointed Kondritzer, who continued to represent Burden on the pending burglary charge, to represent both Burden and Dixon in connection with the Wynn murders.

At the time, the public defender's office had only two staff members: Kondritzer and Michael Moses, his junior colleague. Apparently, the local judges did not enter formal orders designating one or the other to represent particular indigent defendants. Instead, the two attorneys typically divided the cases between them on a geographical basis, with the majority of Kondritzer's cases coming from the northern part of the circuit (which included Washington County). There is no doubt that, for some period of time, Kondritzer represented both Burden and Dixon in connection with the Wynn murders. Whether Burden was aware that Kondritzer also was representing Dixon is not clear; Burden did not, however, request that either the court or Kondritzer end the dual representation.

On November 19, 1981, the trial court held a committal (or preliminary) hearing for Dixon at which Kondritzer made an appearance on Dixon's behalf. Dixon waived his own right to be present. After receiving testimony from the deputy sheriff to whom Dixon had made the statement implicating Burden in the Wynn murders, the court ruled that, while the State had sufficient evidence to hold Dixon as a material witness against Burden, it did not have probable cause to hold him for murder. Dixon remained in custody until the close of Burden's trial because he failed to post the bond necessary to secure his release.

A grand jury indicted Burden for the four murders on December 7, 1981. The State never renewed the murder charges against Dixon. In exchange for his testimony at Burden's trial, Dixon received informal guarantees from the prosecution that he would not be charged in connection with the murders. After the committal hearing, Kondritzer and the chief assistant district attorney discussed Dixon's role in the Wynn murders during informal meetings. At a subsequent federal court evidentiary hearing, Kondritzer remembered those discussions as having resulted in "an understanding ... [that], as long as [Dixon] testified, nothing would happen to him." This informal agreement was never transformed into a formal grant of transactional immunity, which generally requires court approval under Georgia law, see, e.g., State v. Hanson, 249 Ga. 739, 295 S.E.2d 297, 303 (1982), and which the district attor-

---

1. For a more complete recitation of the facts surrounding the underlying crimes at issue here, see *Burden v. State*, 250 Ga. 313, 297 S.E.2d 242, 243–44 (1982), *cert. denied*, 460 U.S. 1103, 103 S.Ct. 1803, 76 L.Ed.2d 367 (1983).

2. The bodies of the four victims were discovered in a pond on August 16, 1974; autopsies revealed that Louise had died from multiple blows to the head while two of the children had been drowned and the third strangled. The Georgia Supreme Court also found that "Louise was clothed only in an undergarment and a dress torn in half. The crime scene revealed an area of disturbed pine straw, possibly evidencing a struggle." *Burden*, 297 S.E.2d at 243.

ney's office apparently granted as a matter of policy only in writing.

At the end of December 1991, Kondritzer left the public defender's office and Moses took over Burden's case. Moses had not previously been involved in the actual representation of Burden or Dixon. With Moses serving as trial counsel, Burden was tried before a jury in March 1982. Dixon was the prosecution's main witness, and his testimony provided the key evidence linking Burden to the murders.[3] Both Dixon on cross-examination and the prosecutor in his closing argument stated that Dixon testified under a promise of immunity from prosecution.[4]

The jury convicted Burden on all counts and, after finding that a statutory aggravating circumstance—that each murder occurred while the defendant was engaged in the commission of another capital felony—existed, recommended that he be sentenced to death for each murder. The court imposed the death sentence as to all four counts on March 4, 1982.[5] On direct appeal, the Georgia Supreme Court affirmed all four convictions and three of the four death sentences (striking the fourth because the doctrine of "mutually supporting aggravating circumstances" precluded the reciprocal use of each murder to justify the death penalty for the others). *Burden v. State,* 250 Ga. 313, 297 S.E.2d 242 (1982), *cert. denied,* 460 U.S. 1103, 103 S.Ct. 1803, 76 L.Ed.2d 367 (1983).

II.

In January 1988, Burden filed his petition for a writ of habeas corpus in federal court. The petition contained eight allegations of error, and the district court denied relief after finding no constitutional infirmity in either the guilt or the penalty phase of Burden's trial. *Burden v. Zant,* 690 F.Supp. 1040 (M.D. Ga.1988) ("*Burden I* "). In this opinion, we are only concerned with Burden's claim that he has been denied the effective assistance of counsel as guaranteed by the Sixth Amendment. The crucial issue is whether Kondritzer, while representing Burden, labored under an actual conflict of interest that adversely affected his performance because Kondritzer, while counsel to both Burden and Dixon, reached an understanding with the prosecutor that Dixon would not be prosecuted in exchange for his testimony against Burden. Because our decision that the writ must be granted cannot be understood without reviewing the history of Burden's petition in the federal courts, we describe it briefly.

Burden appealed the district court's original denial of his habeas corpus petition to this court. We remanded the case to the district court for an evidentiary hearing on Burden's conflict of interest claim because the record lacked the "comprehensive history of both Dixon's and Burden's representation ... necessary for us to evaluate petitioner's conflict of interest claim." *Burden v. Zant,*

3. Dixon testified at Burden's trial that he had driven Burden and the four victims to a secluded pond on the night in question; when he returned later to pick them up, Dixon said, he found Burden walking down the road alone. When Dixon asked where the others were, Burden essentially admitted that he had "hit [Louise Wynn] side the head with something" and that "she fell in the pond or he throwed her in the pond one." Burden indicated to Dixon that the children were in the pond as well, implying that he had killed them, and he warned Dixon not to tell anyone what had happened that night. *See Burden,* 297 S.E.2d at 244.

4. The following colloquy occurred between Moses (Burden's defense counsel) and Dixon on cross-examination:

    Q: Now, Mr. Dixon, have you been promised anything for your testimony today?
    A: Immunity.

    Q: You've been promised immunity in order to testify? Is that correct?
    A: Correct.
In his summation, the prosecutor commented on the credibility of Dixon's testimony as follows:
    What has Henry Lee Dixon got to gain? [The defense is] going to say immunity. The stipulation in this evidence was that the warrants [against Dixon] were dismissed by the Court, and that he was being held as a material witness; not for this offense. His testimony may have, granted, we may have offered him immunity. I think you realize that we did. I'll tell you that we did. Nothing ever came of it because the Court dismissed the charges as was stipulated.

5. Under Georgia law, the jury's sentencing recommendation binds the trial court, which actually sentences the defendant. *See* O.C.G.A. § 17–10–31 (Michie 1990).

871 F.2d 956, 957 (11th Cir.1989) ("*Burden II*"). On remand, the district court held an evidentiary hearing, made factual findings, and again concluded that Burden had received constitutionally adequate representation free from conflicts of interest.[6] While Kondritzer indicated at the hearing that informal discussions with the prosecution had taken place, the district court concluded that there was no evidence that formal transactional immunity had been granted to Dixon. The court discounted the importance of the informal understanding described by Kondritzer because Moses, who actually represented Burden at trial, had not been involved in the dual representation and had cross-examined Dixon vigorously at Burden's trial.

Following the development of the facts upon which the parties' arguments depended, we rejected Burden's claim that his counsel labored under a conflict of interest. *Burden v. Zant*, 903 F.2d 1352 (11th Cir.1990) ("*Burden III*"). In affirming the denial of the writ of habeas corpus, this court relied upon several salient facts. First, an examination of the practices of the two-person public defender's office at the time of Burden's representation revealed that the two lawyers divided cases geographically and handled them independently of one another. *Id.* at 1358–59. Therefore Moses, who succeeded Kondritzer as public defender, had never actively represented Dixon.[7] And while Kondritzer had represented Dixon and Burden simultaneously for some period of time, he did not call Dixon to the stand at the committal hearing or elicit testimony prejudicial to Burden; in fact, he opposed conditioning Dixon's release upon the posting of a bond. *Id.* at 1359. Moreover, we concluded, "the assumption that Dixon received a grant of transactional immunity, negotiated by Kondritzer and the prosecutor in exchange for Dixon's testimony against Burden, is without factual support." *Id.* As such, "while there was a potential conflict of interest ... all charges against Dixon were dropped, and the conflict never became actual in the sense that Kondritzer's representation of Dixon's interests required him to compromise Burden's interests." *Id.*

On Burden's petition for a writ of certiorari, the Supreme Court summarily reversed the decision of this court and remanded the case for us to "consider petitioner's conflict-of-interest claim free from [our] erroneous failure to credit the state trial court's finding that Dixon testified under a grant of immuni-

---

6. During the course of the district court evidentiary hearing, Kondritzer testified as follows:

> Q: And as far as Henry Lee Dixon is concerned, you represented him at the preliminary hearing?
> A: Yes.
> Q: And after the preliminary hearing, did you have discussions with [the prosecutor] about immunity and about him not being prosecuted in the case?
> A: Yes, I believe so.
> Q: Describe those discussions and what were the results of them.
> A: Well, what I remember, informal discussions, nothing—asking him what was going to happen to Dixon and my memory of it was an understanding, you know, as long as he testified, nothing would happen to him.

Later, on cross-examination by the State, Kondritzer reiterated that "[m]y memory is that I had some agreement with [the prosecutor] that nothing would happen to Mr. Dixon." He explained: "I remember him [the prosecutor] saying, 'I'm not interested in Henry Dixon as long as, you know, if he's going to testify. We're not interested in prosecuting him,' words to that effect." Kondritzer could not supply the details of that agreement, beyond the fact that he under-

stood that Dixon would not be prosecuted if he testified.

7. Burden also argued that, even if Moses never actively represented Dixon, Kondritzer's representation of Dixon must be imputed to Moses as a member of the same public defender's office; thus, he contends, a conflict arose because "[a]n attorney who cross-examines a former client inherently encounters divided loyalties." *Lightbourne v. Dugger*, 829 F.2d 1012, 1023 (11th Cir. 1987), *cert. denied*, 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988).

> The court assumed, *arguendo*, that two attorneys in the same public defender's office may be considered one attorney. We see no reason to disturb our earlier ruling that "[g]iven Moses' conduct [in vigorously cross-examining Dixon], ... even if a conflict of interest arose from his representation of a client previously represented by the same public defender's office, ... we perceive no adverse effect upon his representation" in this regard. *Burden III*, 903 F.2d at 1361 (internal citation omitted). *Cf. Lightbourne*, 829 F.2d at 1024 (holding that "even if an actual conflict existed, petitioner has failed to allege such facts which, if proven, would demonstrate that the alleged conflict adversely affected petitioner's representation").

ty." *Burden v. Zant,* 498 U.S. 433, 438, 111 S.Ct. 862, 865, 112 L.Ed.2d 962 (1991) (*"Burden IV"*). The Court was referring to an observation by the state trial court, which appeared in a standard post-conviction report required under Georgia law in all capital cases as an administrative convenience to facilitate review by the Georgia Supreme Court, that Dixon had testified under a grant of immunity.[8] The Court concluded that "[t]his finding, made pursuant to a statutory directive ... and based on Dixon's testimony and the prosecutor's closing argument at trial, ... is a determination of historical fact 'presumed to be correct' for purposes of a federal habeas corpus proceeding" under 28 U.S.C. § 2254(d) (1988). *Id.* at 436–37, 111 S.Ct. at 864 (internal citations omitted).

On remand, in reaffirming our earlier finding that there was no grant of immunity, we held that "the state trial court's observation is not entitled to a presumption of correctness under 28 U.S.C. § 2254(d) because material facts were not adequately developed before the court," *Burden v. Zant,* 975 F.2d 771, 772 (11th Cir.1992) (*"Burden V"*), and that under section 2254(d)(3), the presumption does not extend to state court findings made in such a context. *Id.* at 774–75. The court explained:

> In our judgment, the state trial court's statements in the post-conviction report are not factual findings; they were not the product of an adversary proceeding before the court.... Rather, ... they constitute personal impressions of the trial judge rendered for the purpose of aiding the Georgia Supreme Court's appellate review.

*Id.* at 772 n. 1 (internal citations omitted). As such, the state trial court's comment on Dixon's immunity did not appear in the context of findings of fact and conclusions of law; moreover, no hearing on the issue was ever conducted in the state courts. Thus, we concluded that it would be improper to presume the correctness of the state trial court's comment about Dixon's immunity. Instead, in affirming the federal district court's disposition of Burden's conflict of interest claim, we relied upon the district court's conclusion, after a full hearing on habeas corpus review, that "Dixon did not testify under a grant of transactional immunity or pursuant to a promise that the State would not prosecute him for his part in the crimes at issue." *Id.* at 775.

Judge Anderson dissented, arguing that the record in this case demonstrates that Kondritzer reached an informal understanding with the prosecutor that Dixon would not be prosecuted in exchange for his testimony against Burden. Judge Anderson expressed his belief that the majority's conclusion was erroneous regardless of whether the state court finding is entitled to deference; he relied upon a distinction between a formal grant of transactional immunity and an informal understanding concerning cooperation by Dixon and concluded that, while the district court did find that there was no formal grant, it "did not find as a matter of fact that there was no informal understanding."[9] *Burden V,* 975 F.2d at 776. Moreover, Judge Anderson argued, such a finding, had it been made, would be clearly erroneous because

---

**8.** Under Georgia law, the trial court must file a report in every case in which the death penalty is imposed. *See* O.C.G.A. § 17–10–35(a) (Michie 1990). In Burden's case, the trial judge's report notes that Dixon was "[t]he witness most damaging to the defendant's case." It also states that "Dixon was granted immunity from prosecution and the jury was properly informed of this fact and an appropriate charge was given by the court to the jury."

**9.** In its order entered following the evidentiary hearing on the conflict of interest claim, the district court found that, "[a]fter the committal hearing Mr. Kondritzer had informal discussions with Chief Assistant District Attorney Malone which Mr. Kondritzer remembers resulting in 'an understanding, you know, as long as [Dixon]

testified, nothing would happen to him.' " In the next paragraph, the court also noted that "[a]ccording to Chief Assistant District Attorney Malone transactional immunity, if and when granted, was formally agreed to by the district attorney and all parties. He has no recollection nor is there any other evidence of transactional immunity being granted to Henry Lee Dixon."

Based upon these findings of fact, Judge Anderson submitted that, "in context, the only reasonable reading of the district court's order is that the district court found as a fact that there was no formal grant of transactional immunity, but that the district court made no finding at all as to whether there was an informal understanding between Kondritzer and the prosecutor." *Burden V,* 975 F.2d at 776–77.

"[t]here was overwhelming evidence of an informal agreement that Dixon would not be prosecuted if he testified against Burden." *Id.* at 778.

The Supreme Court again reversed our decision rejecting Burden's claim that he had been deprived of the right to be represented by counsel free from conflicts of interest. *Burden v. Zant,* —— U.S. ——, 114 S.Ct. 654, 126 L.Ed.2d 611 (1994) (*"Burden VI "*). The Court summarized Judge Anderson's opinion approvingly, noting that he had "maintained that the District Court's order contained no [finding that Dixon did not testify pursuant to a promise that the State would· not prosecute him] and that his colleagues had overlooked the record of evidence strongly supporting Burden's contention that some sort of immunity deal had, in fact, been struck." *Id.* at ——, 114 S.Ct. at 654. The Court then explained that, "[r]eviewing the record, we are convinced that Judge Anderson was correct, that the decision of the Court of Appeals was grounded on manifest mistake, and that reversal is warranted on that basis alone." *Id.* at ——, 114 S.Ct. at 655. Accordingly, the Court reversed and remanded for this court "to determine whether Mr. Kondritzer's representation created 'an actual conflict of interest adversely affect[ing] [his] performance.'" *Id.*

### III.

It is well established that "[t]he [S]ixth [A]mendment assures a criminal defendant the right to effective assistance of counsel which includes the right to counsel who is unimpaired by conflicting loyalties." *Duncan v. Alabama,* 881 F.2d 1013, 1016 (11th Cir.1989). While the Supreme Court has stressed that the duty of loyalty (to avoid

conflicts of interest) is "perhaps the most basic of counsel's duties," *Strickland v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984), the Court has also made clear that "[r]equiring or permitting a single attorney to represent codefendants, often referred to as joint representation, is not *per se* violative of constitutional guarantees of effective assistance of counsel," *Holloway v. Arkansas,* 435 U.S. 475, 482, 98 S.Ct. 1173, 1178, 55 L.Ed.2d 426 (1978). The import of the Supreme Court's most recent decision is that Judge Anderson's view of the record in this case becomes law of the case. Thus, we are to assume that, while he was representing both Burden and Dixon, Kondritzer negotiated an informal understanding with the prosecution that Dixon would not be prosecuted for the murders if he testified against Burden at trial. We must now determine the legal significance of that core fact.[10]

### A.

◼ The Supreme Court articulated the standard for reviewing a Sixth Amendment claim of ineffective assistance of counsel based upon an alleged conflict of interest in *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).[11] To establish a Sixth Amendment claim, a criminal defendant "must establish that an actual conflict of interest adversely affected his lawyer's performance." *Id.*. at 350, 100 S.Ct. at 1719. *See also Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067. Once it is established that both prongs of the *Cuyler* test—actual conflict and adverse impact on representation—have been met, a defendant need not show prejudice in order to obtain reversal of his conviction. *Burger v. Kemp,* 483 U.S. 776, 783, 107 S.Ct. 3114, 3120, 97 L.Ed.2d 638

---

**10.** As this court has noted, "[q]uestions involving conflicts of interest are mixed determinations of law and fact subject to *de novo* review." *Porter v. Singletary,* 14 F.3d 554, 561 (11th Cir.1994); *see also Yeck v. Goodwin,* 985 F.2d 538, 540 (11th Cir.1993).

**11.** The familiar standard enunciated in *Strickland* generally governs claims that a defendant has been denied the effective assistance of counsel guaranteed by the Sixth Amendment. Under that test, a defendant must show both that counsel's performance, as measured by the profes-

sional norms prevailing at the time, was deficient and that the inadequate performance prejudiced the defense. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. In *Strickland,* however, the Court expressly noted that claims of ineffective assistance due to conflicts of interest are still to be analyzed under *Cuyler,* in which the Court enunciated the requirements for stating valid ineffective assistance of counsel claims predicated upon alleged conflicts of interest where, as here, the defendant raised no objection at trial. *Id.* at 692, 104 S.Ct. at 2067.

(1987); *Porter v. Singletary*, 14 F.3d 554, 560 (11th Cir.1994). As we have explained, "in the case of an actual conflict, prejudice is presumed." *Danner v. United States*, 820 F.2d 1166, 1169 (11th Cir.1987), *cert. denied*, 484 U.S. 1012, 108 S.Ct. 713, 98 L.Ed.2d 663 (1988).[12]

■ A speculative or merely hypothetical conflict of interest does not yield a Sixth Amendment violation. Indeed, "until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Cuyler*, 446 U.S. at 350, 100 S.Ct. at 1719. In other words, an *actual* conflict is required;[13] the mere possibility of a conflict "is insufficient to impugn a criminal conviction." *Id.* Where a defendant has raised a potential conflict of interest, but has failed to adduce proof of an actual conflict, we have consistently refused to find constitutionally deficient representation. *See, e.g., Porter*, 14 F.3d at 561 (holding that Porter failed to prove an actual conflict because a witness formerly represented by Porter's lawyer testified that he had not been promised anything for testifying against Porter, and because Porter's attorney testified that he did not refrain from asking the witness questions on account of the prior representation).

In order to meet the *Cuyler* criteria for demonstrating an unconstitutional conflict of interest, this court has insisted that a defendant "be able to point to specific instances in the record which suggest an impairment or compromise of his interests for the benefit of another party." *Porter*, 14 F.3d at 560; *see also Oliver v. Wainwright*, 782 F.2d 1521, 1524–25 (11th Cir.), *cert. denied*, 479 U.S. 914, 107 S.Ct. 313, 93 L.Ed.2d 287 (1986).

Accordingly, to prevail on his Sixth Amendment claim, Burden must make a factual showing of inconsistent interests on the part of Kondritzer and "demonstrate that the attorney made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other." *Smith v. White*, 815 F.2d 1401, 1404 (11th Cir.), *cert. denied*, 484 U.S. 863, 108 S.Ct. 181, 98 L.Ed.2d 133 (1987).

### B.

■ In this case, an actual conflict of interest occurred when Burden's pretrial counsel, while representing two persons under suspicion for a murder, reached an informal understanding with the prosecutor that one of his clients would not be prosecuted in exchange for his testimony against the other. Kondritzer was in fact representing both Burden and Dixon at the time the "deal" for Dixon was made. And the record in this case, as interpreted by the Supreme Court, reveals that Kondritzer negotiated some sort of immunity arrangement with the State in exchange for Dixon's testimony. This agreement effectively placed Kondritzer in the position of having to sacrifice one client, Burden, in order to protect another client, Dixon. Given that Burden was indicted and tried on the strength of Dixon's testimony, it is impossible to say that an actual conflict of interest was not created.

It is also clear that the conflict adversely affected Kondritzer's representation of Burden. First, by negotiating an informal immunity deal for Dixon, Kondritzer effectively terminated his opportunity to reach a plea agreement with the State on Burden's behalf. The Supreme Court has recognized that the

---

12. It is appropriate to presume prejudice when counsel is burdened by an actual conflict of interest because, in those circumstances, counsel breaches the duty of loyalty, the most fundamental duty owed the client, and because "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests." *Strickland*, 466 U.S. at 692, 104 S.Ct. at 2067.

13. This court has occasionally defined an "actual conflict of interest" as an instance where "counsel's introduction of probative evidence or plausi-

ble arguments that would significantly benefit one defendant would damage the defense of another defendant whom the same counsel is representing." *Baty v. Balkcom*, 661 F.2d 391, 395 (5th Cir.1981) (Unit B), *cert. denied*, 456 U.S. 1011, 102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982), *quoted in Ruffin v. Kemp*, 767 F.2d 748, 750 (11th Cir.1985). In *Stein v. Reynolds Secur., Inc.*, 667 F.2d 33, 34 (11th Cir.1982), this court adopted as binding precedent all of the post-September 10, 1981, decisions of Unit B of the former Fifth Circuit.

harm from representing conflicting interests lies not just in what the attorney does but also "in what the advocate finds himself compelled to *refrain* from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process." *Holloway*, 435 U.S. at 490, 98 S.Ct. at 1182.

Furthermore, after reaching the understanding with the prosecutor, Kondritzer, to enforce the agreement, had to advise a key witness to implicate his own client. The informal nature of Dixon's understanding with the district attorney made the corrosive effect of the conflict upon Kondritzer's representation of Burden all the more invidious. Because Kondritzer had not obtained in writing the terms of the understanding that Dixon would not be charged in connection with the murders if he testified against Burden, Dixon had no way to demonstrate that he was immune from subsequent prosecution because he had met his end of the bargain. Instead, Dixon could only rely on the State's acceptance of his performance as sufficient. That ambiguity would have made Dixon, and Kondritzer as his counsel, all the more solicitous of the prosecution's needs and wishes. As a result, Kondritzer's pretrial representation of Burden was clearly compromised.

The facts of this case are strikingly similar to those in *Ruffin v. Kemp*, 767 F.2d 748 (11th Cir.1985), in which this court held that an attorney who had been appointed to represent codefendants and who attempted to arrange a plea bargain for one that called for testimony against the other labored under an unconstitutional conflict of interest. In that case, Judson Ruffin, a state prisoner who was under a sentence of death, sought habeas corpus relief in federal court on the grounds that his attorney had negotiated a tentative plea agreement for a codefendant, Nathan Brown, whom the attorney also represented, in exchange for Brown's testimony at Ruffin's trial. This court concluded that defense counsel " 'resolved' the conflict of interest by breaching his duty of loyalty to one client in favor of another" and held that "[i]t is clear beyond cavil that in offering the testimony of Brown against Ruffin in exchange for the lesser penalty for Brown, [the attorney's] conduct 'would significantly benefit one de-

fendant ... [while] damag[ing] the defense of another defendant whom the same counsel is representing.' " *Id.* at 751 (quoting *Baty v. Balkcom*, 661 F.2d 391, 395 (5th Cir.1981) (Unit B)). Moreover, the court explained, the attorney's "conduct of actual plea bargain negotiations for Brown, offering as part of the deal Brown's testimony against his own client, precluded effective plea bargaining on behalf of Ruffin and thus constituted an adverse impact on counsel's performance." *Id.* at 752. Accordingly, the court remanded the case with instructions that the district court issue the requested writ of habeas corpus.

Here, as in *Ruffin*, the defendant's lawyer negotiated an immunity agreement for another client in connection with the same case, thereby securing the testimony of the chief witness for the State at the defendant's trial. *Cf. Yeck v. Goodwin*, 985 F.2d 538, 541 (11th Cir.1993) (finding no adverse effect upon counsel's representation because the testimony of the codefendant for whom counsel negotiated a plea agreement actually supported the accused's defense of consent). Also, as in *Ruffin*, the attorney's actions here in negotiating a promise of immunity for one client precluded effective plea bargaining on behalf of the other. *Cf. Smith v. Newsome*, 876 F.2d 1461, 1464 (11th Cir.1989) (holding that the performance of petitioner's lawyer was not adversely affected because "joint representation did not prevent effective plea bargaining on behalf of either client" ). This case therefore falls squarely within the body of precedent finding conflicts of interest sufficient to invalidate criminal convictions on a petition for a writ of habeas corpus. Accordingly, we conclude that Kondritzer's representation of both Dixon and Burden in connection with the Wynn murders violated Burden's Sixth Amendment right to the effective assistance of counsel.

## IV.

The Supreme Court's most recent opinion in this case concluded that Kondritzer had negotiated an informal immunity agreement for Dixon and charged this court on remand with determining whether, under *Cuyler*, Kondritzer's actions created an actual conflict of interest that adversely affected his performance. *Burden VI*, —— U.S. at ——,

114 S.Ct. at 655. Having found both an actual conflict of interest and an adverse impact on the attorney's performance, we REVERSE the decision of the district court and REMAND the case with the instruction that the district court issue the writ of habeas corpus.

IT IS SO ORDERED.