[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 00-12207
_____

D. C. Docket No. 94-02859-CV-RLV-1

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 15, 2001
THOMAS K. KAHN
CLERK

JANSSEN REYNOLDS,

Petitioner-Appellant,

versus

JOHN CHAPMAN, Warden, et al.,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(June 15, 2001)

Before WILSON and COX, Circuit Judges, and RYSKAMP*, District Judge.

_____

*Honorable Kenneth L. Ryskamp, U.S. District Judge for the Southern District of Florida, sitting by designation.

WILSON, Circuit Judge:

Janssen Reynolds, a Georgia prisoner serving concurrent life sentences for rape, kidnaping, and aggravated sodomy, appeals from the district court's denial of his petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Reynolds argues that his defense attorney, William Hankins, labored under conflicts of interest at both the pre-trial and the immediate post-trial stages of Reynolds's case, and that these conflicts rendered Hankins's representation of Reynolds constitutionally ineffective. After a careful consideration of the briefs and the record, we conclude that Hankins had a potential conflict of interest at the pre-trial stage of Reynolds's case that never ripened into an actual conflict. However, at the post-trial stage, Hankins operated under an actual conflict of interest that resulted in a compromise of Reynolds's interests for the benefit of another party. The representation that Reynolds received in this post-trial period was constitutionally deficient, and the district court erred in failing to make such a finding. Accordingly, we affirm in part, reverse in part, and remand the case to the district court, with instructions to direct the Superior Court of DeKalb County,

2

Georgia to grant petitioner the opportunity for new post-trial proceedings on the basis of his claims of ineffective assistance of post-trial counsel.[1]

## I.

## FACTS

Reynolds and three co-defendants (Arlee Harris, Andrew Lee Curtis, and Shionoski Thomas) were indicted by a DeKalb County, Georgia grand jury in 1981 for the kidnaping, rape, sodomy, and robbery of Caroline Garritano and aggravated assault upon her former boyfriend, Kevin Companik. Each of the defendants was individually represented, but the attorneys for Reynolds, Harris, and Thomas all worked in the office of the DeKalb County Public Defender. Curtis retained a private attorney for his defense.

In the pretrial period, the attorneys for co-defendants Harris and Thomas worked out a plea arrangement with the state, whereby Harris and Thomas would plead guilty to the rape charge and accept a sentencing recommendation of twenty years, to serve eight years. In exchange, the remainder of the charges would be *nolle prossed*. Hankins informed Reynolds of the possibility of securing a plea arrangement from the prosecutors, and discussed the possible benefits of accepting

---

[1] These new post-trial proceedings should include the opportunity to file a Motion for a New Trial, as well as the opportunity for a new appeal.

a plea arrangement versus the possible risks of going to trial.[2] Reynolds rejected

the offer, insisting on his innocence, and elected to take his chances at trial.

On the morning of the trial, Hankins informed Reynolds that Harris and

Thomas had accepted the plea deal outlined above. Upon learning that two of his

co-defendants had taken this step, Reynolds asked Hankins to attempt to secure the

same plea arrangement. The prosecutor was unwilling to make the same offer to

Reynolds, and instead offered to permit him to plead guilty to the rape charge

without a sentencing recommendation in exchange for the state's agreement to

*nolle prosse* the other charges. Reynolds found this proposed plea deal

unacceptable, and the case went to trial.

Reynolds and his remaining co-defendant, Curtis, took substantially adverse

positions at the trial. Reynolds' defense relied heavily on the fact that the

evidence against Curtis was stronger than the evidence implicating Reynolds, and

Reynolds hoped to profit by the comparison.[3] Reynolds did not testify at trial,

---

[2] The terms of the plea arrangement Reynolds was offered at this point are unclear. In testimony offered at a subsequent federal evidentiary hearing, the prosecutor in Reynolds's case indicated that he felt Reynolds was more culpable than co-defendants Thomas and Harris, and recalled that he offered to permit Reynolds to plead guilty to rape in exchange for an agreement to serve twenty years. The magistrate judge's Report and Recommendation suggests that Reynolds was offered the same plea arrangement as Harris and Thomas. In any event, it is clear from the record that Hankins engaged in plea negotiations with the prosecutor on Reynolds's behalf, and that Reynolds rejected the state's offer.

[3] Hankins testified at the federal habeas evidentiary hearing that his strategy had been to shift as much blame as possible onto Curtis and the absent co-defendants, and to "shrink in the

though Curtis did, where he denied participation in the crime and testified that his only encounter with the victim on the night in question came when she voluntarily entered his house (presumably after the crime occurred) and asked to use the restroom. Curtis's mother corroborated his story, and as a result of this testimony, the trial judge held her in contempt of court for perjury and had her incarcerated. Neither Harris nor Thomas testified at trial.

Hankins's strategy proved unsuccessful, as both Curtis and Reynolds were convicted of rape, aggravated sodomy, kidnaping, and the lesser included offense of simple battery. Both defendants were sentenced to concurrent life terms on the rape, sodomy, and kidnaping charges, and 12-month sentences on the simple battery count, also to be served concurrently.

The lawyer representing Curtis withdrew after the trial, and the trial judge appointed Hankins to represent both Curtis and Reynolds at the "Motion for a New Trial" stage of the case. Hankins filed a motion for a new trial solely on Reynolds's behalf on March 12, 1982; on March 22 of that year, he filed the same motion on Curtis's behalf. On March 17, 1983, Hankins filed a "brief in support of defendant's motion for a new trial" which contained the names of both Curtis and

_____

courtroom and be out of sight." Hankins's strategy was not without foundation. The victim clearly identified Curtis as being one of her attackers, and there was scientific evidence linking Curtis to the crime, while neither of these conditions held true for Reynolds.

Reynolds.[4]  In the brief, he made a series of arguments for a new trial on behalf of both defendants.  On March 31, 1983, the court denied both defendants' motions.  Curtis secured separate counsel for his appeal.

## PROCEDURAL HISTORY

The procedural history of this case is lengthy and complex, though our recounting of it will be brief.  Following an unsuccessful direct appeal, Reynolds filed two state and two federal petitions for writs of habeas corpus over the next seven years.  During the course of his second federal habeas petition, Reynolds became aware of two especially salient facts: (1) that Hankins was a member of the same public defender's office as the attorneys that represented his co-defendants Harris and Thomas, and (2) that Hankins represented both Curtis and Reynolds in the post-trial stages of the case.   As Reynolds was unaware of these problems until this point, he had not addressed them in any state collateral proceeding, and the district court dismissed his habeas petition without prejudice so that he could make the conflict of interest arguments at the state level.  Reynolds promptly filed a third state habeas petition, arguing that his counsel labored under an unconstitutional conflict of interest in both the pre-trial and post-trial stages of his case.

---

[4]The record does not reflect the reason for the year-long hiatus separating the motions for a new trial and the brief in support of those motions.

In June of 1994, the Muscogee County Superior court dismissed Reynolds's third habeas petition as successive under Georgia law. After the Georgia Supreme Court affirmed, Reynolds filed the instant petition for federal habeas corpus relief in the Northern District of Georgia in October of 1994. While the state argued that the instant petition was procedurally defaulted, the magistrate judge assigned to the case found that the petition met the "cause and prejudice" exception to the procedural default rule. The magistrate judge further recommended granting Reynolds's habeas petition, as Reynolds had successfully demonstrated that his attorney labored under conflicts of interest at both the pre-trial and post-trial stages of the case.

Following an objection by the respondent, the district court declined to accept the magistrate judge's recommendation, and returned the case to the magistrate judge for further briefing and consideration. In April of 1999, the magistrate judge issued a new Report and Recommendation, again finding that the cause and prejudice rule excused Reynolds's procedural default. However, this time the magistrate judge recommended that the district court deny Reynolds relief on the conflict of interest claims. The district court adopted the magistrate's recommendation in January of 2000, and granted a certificate of appealability

limited to the issue of whether Reynolds was denied the effective assistance of counsel due to his attorney's possible conflict(s) of interest.

## II.

## DISCUSSION

We review a district court's decision to grant or deny a habeas petition *de novo*. *See Sims v. Singletary*, 155 F.3d 1297, 1304 (11th Cir. 1998). The substance of this appeal concerns whether an attorney rendered ineffective assistance due to a conflict of interest, which is a mixed question of law and fact also subject to *de novo* review.[5] *See id*; *Freund v. Butterworth*, 165 F.3d 839, 862 (11th Cir. 1999) (en banc), *cert. denied*, 528 U.S. 817 (1999).

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to effective assistance of counsel, and effective assistance includes a right to counsel "unimpaired by conflicting loyalties." *Duncan v. Alabama*, 881 F.2d 1013, 1016 (11th Cir. 1989). The duty of unfettered loyalty to one's clients is among the most central of a criminal defense attorney's responsibilities. *See Strickland v. Washington*, 466 U.S. 668, 692 (1984).

---

[5] A district court's findings of fact in a habeas proceeding are reviewed for clear error. *See Byrd v. Hasty*, 142 F.3d 1395, 1396 (11th Cir. 1998).

Ineffective assistance of counsel claims in the conflict of interest context are governed by the standard articulated by the Supreme Court in *Cuyler v. Sullivan*, 446 U.S. 335 (1980). *Cuyler* establishes a two-part test that we use to evaluate whether an attorney is constitutionally ineffective due to a conflict of interest. To show ineffectiveness under *Cuyler*, a petitioner must demonstrate: (a) that his defense attorney had an actual conflict of interest, and (b) that this conflict adversely affected the attorney's performance. See *Cuyler*, 446 U.S. at 348-49.

A series of opinions from this court have interpreted and refined the meaning of both prongs of the *Cuyler* test. To satisfy the "actual conflict" prong, a defendant must show something more than "a possible, speculative, or merely hypothetical conflict." *Lightbourne v. Dugger*, 829 F.2d 1012, 1023 (11th Cir. 1987). In *Smith v. White*, 815 F.2d 1401 (11th Cir. 1987), we developed a test that enables us to distinguish actual from potential conflicts of interest:

> We will not find an actual conflict of interest unless appellants can point to specific instances in the record to suggest an actual conflict or impairment of their interests . . . . Appellants must make a factual showing of inconsistent interests and must demonstrate that the attorney made a choice between possible alternative causes of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other. If he did not make such a choice, the conflict remain(s) hypothetical.

*Smith*, 815 F.2d at 1404.

9

Assuming a defendant can demonstrate that his attorney labored under an actual conflict of interest, the *Cuyler* test demands that he show that this conflict adversely affected the representation he received.  To prove adverse effect, a defendant needs to demonstrate: (a) that the defense attorney could have pursued a plausible alternative strategy, (b) that this alternative strategy was reasonable, and (c) that the alternative strategy was not followed because it conflicted with the attorney's external loyalties.  *See Freund*, 165 F.3d at 860.

We now apply these principles to each of Reynolds's claims.

### A) *Conflict of Interest at the Pre-trial Stage*

Reynolds contends that he did not receive Hankins's undivided loyalty in the pre-trial stage, because Hankins's law office (the DeKalb County Public Defender's Office)  represented two co-defendants with interests contrary to Reynolds's.  The structure of Reynolds's argument is as follows: (a) public defenders offices are "law offices" and should be treated as a law firm for the purposes of a conflict of interest analysis, (b) conflicts affecting one member of a law firm or law office are attributable to all members of the firm, (c) the interests of defendants Harris and Thomas were contrary to those of Reynolds, and one law office cannot have represented the three of them without an actual conflict of

interest, and (d) the conflict adversely affected Reynolds because he did not secure the same plea arrangement as his co-defendants.

We can tentatively accept the first two premises of Reynolds's argument. While public defenders' offices have certain characteristics that distinguish them from typical law firms, our cases have not drawn a distinction between the two. *See Lightbourne*, 829 F.2d at 1023 n.12 (finding that under the Florida Code of Professional Responsibility, "a conflict may arise when a public defender's office represents clients with adverse interests."); *Mills v. Singletary*, 161 F.3d 1273, 1287 (11th Cir. 1998) (acknowledging the possibility of a conflict of interest in simultaneous representation of co-defendants by public defender's office).

It is also well established in this circuit that a lawyer's confidential knowledge and loyalties can be imputed to his current partners and employees. *See United States v. Kitchin,* 592 F.2d 900, 904 (5th Cir. 1979)[6]; *Cox v. American Cast Iron Pipe Co.*, 847 F.2d 725, 729 (11th Cir. 1988)*; Freund*, 165 F.3d at 860, n. 33. The current disciplinary rules of the state bar in Georgia preclude an attorney from representing a client if one of his or her law partners cannot represent that client due to a conflict of interest.  *See Ga. Rules of Professional Conduct*, §4-102, Rule

---

[6] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the Former Fifth Circuit handed down prior to October1, 1981.

1.10(a) (2000).[7] The duties and loyalties of a particular attorney are imputed to his partners and employees, and Reynolds is correct that a law office that represents criminal defendants with divergent interests risks running afoul of its clients' Sixth Amendment rights.

The circumstances surrounding Hankins's representation of Reynolds in the pre-trial stage were sufficient to create a substantial risk of a conflict of interest. Hankins's professional colleagues in the public defender's office were representing Reynolds's co-defendants, and those co-defendants happened to be the very persons whom Reynolds blamed for the crime. The possibility that the interests of one of the three co-defendants would be sacrificed for the benefit of the others was considerable in such a situation. Reynolds has successfully demonstrated that a potential conflict of interest existed in the representation of these three co-defendants by the same public defender's office, given the factual posture of this case.

However, Reynolds cannot take the necessary next step, and demonstrate that this potential conflict ever blossomed into an actual conflict within the meaning of *Cuyler*. An application of the test this court developed in *Smith v.*

---

[7] A similar rule was in effect in Georgia at the time of Reynolds's trial. *See Ga. Code of Professional Responsibility*, Directory Rule § 5-105(d) (1980).

12

*White* to the facts of the instant case will illustrate the absence of an "actual conflict."

Smith requires a petitioner to do two things to demonstrate that his attorney labored under an "actual conflict;" first, he must make "a factual showing of inconsistent interests," and second, he must demonstrate that his attorney acted in some way that reflected the reality of these conflicting interests, such as "eliciting (or failing to elicit) testimony helpful to one client or harmful to the other." *See Smith,* 815 F.2d at 1404-05. Reynolds has likely made the requisite factual showing of inconsistent interests. Reynolds was strategically committed to a defense based upon the supposition that he witnessed, but did not participate in, the crimes of his co-defendants. "Blame-shifting" defenses among co-defendants are a reflection of inconsistent interests, and Reynolds has successfully demonstrated that he sought to employ such a defense in this case.

However, Reynolds has not shown that Hankins performed in a manner that in any way reflected the divided loyalties of his office. The factual findings of the district court indicate that Hankins discharged his duties to Reynolds in a way completely consistent with Reynolds's interests. In the early stages of the representation, Hankins timely informed Reynolds of the plea arrangement the prosecutor offered, explained the implications of pleading guilty, as well as the

13

risks and possible benefits of going to trial. Hankins accepted Reynolds's decision to risk an adverse verdict at trial. Hankins informed Reynolds the day of the trial of the fact that Harris and Thomas had accepted a particular plea arrangement, and Reynolds, changing his mind, decided to accept the offer if available. The prosecutor declined to make the same offer to Reynolds, and Hankins informed Reynolds of the conditions under which the prosecutor would accept a guilty plea. Nothing in any of Hankins's actions indicates that he was affected by the fact that his colleagues negotiated guilty pleas for two of his client's co-defendants.

Reynolds argues that the instant case should be analogized to two earlier decisions of this court: *Burden v. Zant*, 24 F.3d 1298 (11th Cir. 1994), and *Ruffin v. Kemp*, 767 F.2d 748 (11th Cir. 1985). In both *Burden* and *Ruffin*, we found an actual conflict of interest existed where an attorney representing two co-defendants negotiated a plea arrangement for one in exchange for his testimony against the other.

The present case is distinguishable from *Ruffin* and *Burden*. In both of those cases, the defense attorney to made a clear choice to sacrifice the interests of one client for the benefit of another. It is obviously impossible to effectively serve both clients' interests in such a zero-sum game.

In the instant case, however, Harris's and Thomas's decisions to plead guilty do not appear to have affected Reynolds's prospects of securing a plea agreement. There is no evidence in the record suggesting that Harris's and Thomas's pleas prevented effective plea bargaining for Reynolds. In fact, Hankins faithfully relayed the prosecutor's early plea overtures to Reynolds, who rejected them. Reynolds received several opportunities to make a deal with the prosecutor in exchange for a reduced sentence, and it was his decision to decline such an arrangement. Reynolds has not demonstrated that the guilty pleas of Harris and Thomas adversely affected his options in the pre-trial stage. *See Smith v. Newsome*, 876 F.2d 1461, 1463-64 (11th Cir. 1989) (holding that a lawyer's performance was not adversely affected when "joint representation did not prevent effective plea bargaining for either client.")

The ultimate fact is that Reynolds cannot identify any flaw in Hankins's performance that was related to the fact that Hankins's co-workers represented Harris and Thomas. Indeed, the record reflects that Hankins's representation of Reynolds at the pretrial stage was vigorous, loyal, and thorough. As such, Reynolds cannot demonstrate that Hankins labored under an "actual conflict" of interest at this stage of the proceedings, and thus cannot meet the first prong of the *Cuyler* test.

15

### B) Conflict of Interest at the Post-Trial Proceedings

A glance at the facts surrounding Hankins's post-trial representation of Reynolds reflects the problematic nature of that representation. Hankins was in the untenable position of advancing arguments urging that two defendants be granted a new trial after each of those defendants had spent the entire trial attempting to foist blame on the other. Reynolds suggests that Hankins's loyalty to Curtis prevented Hankins from advancing certain credible arguments on Reynolds's behalf. A close look at the record vindicates Reynolds's claim.

Hankins testified that his trial strategy was based largely on a desire to shift blame for the charged crimes to Curtis. Hankins felt that the evidence against Curtis was considerably stronger than the evidence against Reynolds, and he hoped that Reynolds would benefit from a comparison. This strategy was ultimately unsuccessful, as both Curtis and Reynolds were convicted.

The brief Hankins filed in support of Curtis's and Reynolds's motion for a new trial contains a number of arguments on Reynolds's behalf, many of them focusing on the lack of incriminating evidence against Reynolds. The brief notes, for example, that Garritano could not identify Reynolds in a photographic lineup, and that there was not adequate corroboration of Reynolds's alleged confession.

16

General arguments about the propriety of the jury instructions (made on behalf of both defendants) were also included in the brief.

One argument that would seem to be dictated by the facts of the case is notably absent from the brief. The fact that much of the evidence presented at trial implicated Curtis, but not Reynolds, could lead to the conclusion that the jury did not properly distinguish the two defendants. Indeed, the stark differences in the incriminating evidence presented at trial would likely direct most defense attorneys to precisely this conclusion. The general argument concerning the relative lack of evidence against Reynolds could be enhanced considerably through specific references to the strength of the evidence against Curtis. At the evidentiary hearing in the instant case, Hankins conceded that he considered making the argument that Reynolds was unfairly tainted by the strength of the evidence against Curtis, and that this argument was plausible given the evidence presented at trial.

Another argument absent from the four-page brief concerns the effect that the false testimony of Curtis and his mother had upon Reynolds. Curtis's self-serving statement suggesting that Garritano had appeared at his doorway after the crime occurred permitted the inference that Reynolds, Harris, and Thomas had committed the crime without his assistance. The fact that Curtis's mother was held in contempt for corroborating Curtis's testimony indicates that it was false, as well

17

as possibly prejudicial to Reynolds.  Hankins admitted that he could have argued that the false testimony of Curtis and his mother was prejudicial to Reynolds, and that such an argument would be plausible.

The magistrate judge's Report and Recommendation (adopted in full by the district court) found, as a matter of fact, that "petitioner [failed] to show that counsel could have raised any other issue that was not raised on appeal."  This cursory finding is belied by the record.   Hankins admitted that there were at least two plausible arguments that he could have advanced on Reynolds's behalf at the motion for a new trial stage, and the record reflects that these arguments were not made in the brief supporting the motion for a new trial.  The magistrate judge's failure to find as a matter of fact that Hankins **could** have raised these arguments at the post-trial stage amounts to clear error given the record that we have.

Other than the above, the magistrate judge made no detailed factual findings on the post-trial conflict of interest issue.  Given our finding of clear error in the magistrate judge's determination that Hankins could not have raised additional arguments on Reynolds's behalf in the post-trial phase, we would ordinarily remand the case to the district court for an application of the *Cuyler* test. Appropriate application of *Cuyler* depends heavily on the facts surrounding an

18

attorney's performance, and the district court is the appropriate venue for the resolution of factual questions.

However, in this case, we have an adequate record before us to make remand for more detailed factual findings superfluous. The record provides us with a more than sufficient factual basis to appropriately apply the *Cuyler* test to the representation Reynolds received in the post-trial stages of his case. Remand would waste judicial resources given the sufficiency of this record. *See Perkins v. Matthews*, 400 U.S. 379, 386-87 (1971) (remand unnecessary when record is adequate to enable reviewing court to decide issue on appeal). Indeed, we have previously applied *Cuyler* without remanding in cases in which the record was clear as to the factual circumstances surrounding an attorney's actions, even when the district court made no factual findings concerning those actions. *See Burden*, 24 F.3d at 1303-05 (applying *Cuyler* test after finding that record demonstrated that attorney negotiated informal plea arrangement to grant one client immunity in exchange for testimony against other, even when district court made no specific factual finding of such).

Applying *Cuyler* to the facts (as reflected in the record) surrounding Reynolds's post-trial representation, it is clear that Curtis and Reynolds had inconsistent interests both at trial and post-trial. The inconsistent interests are

19

illustrated by the arguments that Hankins refrained from making at the motion for a new trial stage of the proceedings. Reynolds could have argued that (a) the jury unfairly failed to distinguish him from Curtis, when the evidence against Curtis, but not Reynolds, was overwhelming, and (b) Reynolds was unfairly prejudiced by the perjurious testimony of Curtis and Curtis's mother. Hankins declined to make either of these arguments on behalf of Reynolds; indeed, he could not make such arguments without breaching his duty of loyalty to Curtis. This was a truly untenable position for any attorney. Hankins even admitted that, "looking back on it," he may have had a conflict of interest in the post-trial stage. The import of these facts is that Hankins represented clients with conflicting interests, and he declined to advance certain plausible arguments on behalf of one due to the effect those arguments would have on the other. This circumstance satisfies the "actual conflict" prong of the *Cuyler* test.

*Cuyler* further requires that a petitioner that has demonstrated an actual conflict show that the conflict "adversely affected" his lawyer's performance. Reynolds has demonstrated the requisite adverse effect that the joint representation had upon Hankins's performance. Hankins had at least two plausible arguments available to him that could have advanced Reynolds's case for a new trial. Both of these arguments are reasonable; indeed, they could have added considerable

20

context to the vague arguments that were advanced on Reynolds's behalf in the brief supporting the motion for a new trial. Finally, neither argument could be made because doing so would have prejudiced Curtis's interests. Reynolds need not show that the outcome of the proceeding would have been different had Hankins made the arguments in question. He merely must demonstrate that his attorney's conflict of interest had an effect upon the representation that he received. *See Lightbourne*, 829 F.2d at 1023 ("Once a defendant satisfies both prongs of the *Cuyler* test, prejudice is presumed and the defendant is entitled to relief.")

Given the above, it is clear that Reynolds has produced evidence demonstrating that his attorney labored under a conflict of interest in the immediate post-trial stage of his case. This conflict rendered Reynolds's attorney constitutionally ineffective, and Reynolds is entitled to habeas relief granting him the opportunity for new post-trial proceedings.

## CONCLUSION

In conclusion, Reynolds has shown that Hankins had a potential conflict of interest in the pretrial stage of the case, as several co-defendants with interests inconsistent with those of Reynolds were represented by members of Hankins's law office. Nonetheless, this prospective conflict never ripened into an actual

conflict of interest. Reynolds was never able to identify any action Hankins took (or did not take) at that stage that was influenced by the conflicted loyalties of his office, and therefore could not demonstrate an actual conflict of interest within the meaning of *Cuyler*.

However, Reynolds has successfully demonstrated that Hankins labored under a conflict of interest in the immediate-post trial proceedings of his case. The conflict rendered Hankins's representation of Reynolds constitutionally ineffective at this post-trial stage. Reynolds is entitled to new post-trial proceedings as a result of this error.

Therefore, we affirm the denial of Reynolds's habeas petition with respect to his claim of constitutional error at the pre-trial stage of his case. However, we reverse the district court's denial of his habeas petition with respect to his claim of constitutional error at the post-trial stage of the case, and remand the matter to the district court, with instructions that the DeKalb County Superior Court be directed to grant Reynolds the opportunity for new post-trial proceedings.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

No. 00-12207, *Reynolds v. Chapman, et al.*

--------------------------------------------------------

COX, Circuit Judge, concurring in part and dissenting in part:

I concur in the court's opinion rejecting Reynolds's claim of constitutional error at the pre-trial stage of his case. But I dissent from the court's conclusion that there was constitutional error at the post-trial stage of the case. I would remand the post-trial claim to the district court for appropriate fact-finding.

The magistrate judge, despite recommending that Reynolds's application be denied, made no findings of historical fact regarding Hankins's post-trial representation or whether his post-trial performance was hampered by a conflict of interest. While the district court rejected Reynolds's post-trial claim, adopting the magistrate judge's conclusion that Reynolds had failed to carry his burden of proving either that his attorney had an actual conflict or that his performance was adversely affected by such a conflict, the court did not engage in further fact-finding.

What Hankins failed to do post-trial that he ought to have done, and why he failed to do it, are questions of fact — not questions of law, *see Porter v.*

23

*Singletary*, 14 F.3d 554, 561 (11th Cir. 1994) — and fact-finding is the job of the district court. Today's court, ignoring this principle, proceeds to find the historical facts and grant relief.

The court finds "adverse effect" from Hankins conflict in his failure to make two arguments in support of Reynolds's motion for a new trial. No remand is necessary, the court concludes, because the facts are "clear." The facts, however, are not clear to me.

It is always reasonable strategy, I suppose, to file a motion for a new trial in a criminal case. But the arguments the court finds that Hankins should have advanced do not possess much substance. *See Freund v. Butterworth*, 165 F.3d 839, 860 (11th Cir. 1999) (en banc) (alternative strategy must possess sufficient substance to be a viable alternative). There were only two defendants on trial, and an argument that the jury did not properly distinguish the two defendants in this case would not impress a trial judge. Similarly, an argument that Reynolds should get a new trial because Curtis and his mother perjured themselves in an unsuccessful attempt to exculpate Curtis is also lacking in substance. So, the facts are not so clear to me, and the proper disposition of this appeal in my view is to vacate the judgment denying relief on the post-trial claim and remand to the district court for appropriate fact-finding.